# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EDERRA PLASTIC SURGERY, P.C., *a Georgia professional corporation*; JRK GLOBAL INC., *a Pennsylvania corporation*; FREDERICK A. COVILLE, M.D., P.C., *a New Jersey professional corporation*; HORMONAL WELLNESS OF LA JOLLA, INC., *a California corporation*; TREASURE COAST COSMETIC ENTERPRISES, LLC, *a Florida limited liability company*; DISAPPEARING INK AFFORDABLE TATTOO REMOVAL, LLC, *a Pennsylvania limited liability company*; OMEGA AESTHETICS, LLC, *a Georgia limited liability company*; GEORGES KAADO MEDICINE, P.C., *a Virginia professional corporation*; SKIN PERFECT RANCHO CUCAMONGA, INC., *a California corporation*; YALE MITCHELL KADESKY, P.C., *a California professional corporation*; AMERICAN COMPREHENSIVE WEIGHT LOSS CENTER, INC., *a Pennsylvania corporation*; LITTLEROCK FAMILY MEDICINE, P.S., *a Washington professional service corporation*; MEHMET C. PEKEROL M.D., P.C., *a California professional corporation*; WEIGHLESS MD LLC, *a Wisconsin limited liability company*; LASH HOUSE, LLC, *a New Jersey limited liability company*; NORTH CREEK MEDICINE INC., P.S., *a Washington professional services corporation*; MARION ANESTHESIA, P.C., *a Virginia professional corporation*; BERNADETTE BONAPARTE, M.D., P.A., *a Texas professional association*; BODY NV LLC, *a Nevada limited liability company*; DYNAMIC BODY SCULPTING, P.C., *a Georgia domestic professional corporation*; SEWICKLEY MED SPA, LLC, *a limited liability corporation*; PLASTIC SURGERY SPECIALISTS, P.C., *a Maryland professional corporation*; SAVANNAH FACIAL PLASTIC SURGERY, LLC, *a Georgia limited liability company*; and ORLANDO PLASTIC SURGERY CENTER LLC, *a Florida limited liability company*, | Case No. _____<br><br><br>**COMPLAINT FOR DAMAGES**<br><br><br>**JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| CYNOSURE, INC., *a Delaware corporation*, | |
| Defendant. | |

# TABLE OF CONTENTS

**Page**

I. NATURE OF THE CASE ..................................................................................1

II. PARTIES ........................................................................................................3

III. JURISDICTION AND VENUE ....................................................................12

IV. FACTUAL BACKGROUND ........................................................................13

    A. The noninvasive body-contouring market is a lucrative place for medical device manufacturers to compete....................................................13

    B. Cynosure developed SculpSure to compete against other body-contouring machines. ....................................................................................15

    C. Cynosure aggressively markets SculpSure to physicians and practitioners as a superior device requiring only one 25-minute, pain-free treatment to achieve results.......................................................................19

    D. SculpSure does not work as represented, rendering the product effectively useless for practitioners and physicians..................................................23

    E. Cynosure misrepresented SculpSure's attributes to Plaintiffs, which have been damaged because SculpSure is unfit for its intended purpose. ....................26

        1. Ederra Plastic Surgery, P.C. d/b/a Ederra Bella Plastic Surgery ...............26

        2. JRK Global Inc. d/b/a Method Aesthetics & Wellness.............................29

        3. Frederick A. Coville, M.D., P.C. d/b/a Cornerstone Plastic Surgery & Aesthetic Medicine ................................................................30

        4. Hormonal Wellness of La Jolla, Inc. .........................................................33

        5. Treasure Coast Cosmetic Enterprises, LLC d/b/a Ocean Med Spa ..........35

        6. Disappearing Ink Affordable Tattoo Removal, LLC d/b/a Disappearing Ink ........................................................................................36

        7. Omega Aesthetics, LLC d/b/a Omega MedSpa.........................................38

        8. Georges Kaado Medicine, P.C....................................................................39

        9. Skin Perfect Rancho Cucamonga, Inc. d/b/a Skin Perfect Medical Aesthetics ...................................................................................................40

        10. Yale Mitchell Kadesky, P.C.......................................................................42

11.    American Comprehensive Weight Loss Center, Inc..................................43

12.    Littlerock Family Medicine, P.S. ..............................................................45

13.    Mehmet C. Pekerol M.D., P.C. ................................................................46

14.    Weighless MD LLC d/b/a WeighLess MD and Wellness ........................48

15.    Lash House, LLC d/b/a Lash House Beauty Boutique .............................50

16.    North Creek Medicine Inc., P.S. d/b/a North Creek Medicine & Aesthetics ...............................................................................................51

17.    Marion Anesthesia, P.C. ...........................................................................53

18.    Bernadette Bonaparte, M.D., P.A. ............................................................55

19.    Body NV LLC ............................................................................................57

20.    Dynamic Body Sculpting, P.C. .................................................................59

21.    Sewickley Med Spa, LLC ..........................................................................62

22.    Plastic Surgery Specialists, P.C. ..............................................................64

23.    Savannah Facial Plastic Surgery, LLC .....................................................66

24.    Orlando Plastic Surgery Center LLC ........................................................68

V.    CLAIMS ALLEGED .........................................................................................70

COUNT I VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT  (G.L. CHAPTER 93A) .........................................................70

COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY ......................71

COUNT III UNJUST ENRICHMENT.........................................................................73

PRAYER FOR RELIEF ...............................................................................................74

JURY DEMAND ..........................................................................................................74

Plaintiffs Ederra Plastic Surgery, P.C.; JRK Global Inc.; Frederick A. Coville, M.D., P.C.; Hormonal Wellness of La Jolla, Inc.; Treasure Coast Cosmetic Enterprises, LLC; Disappearing Ink Affordable Tattoo Removal, LLC; Omega Aesthetics, LLC; Georges Kaado Medicine, P.C.; Skin Perfect Rancho Cucamonga, Inc.; Yale Mitchell Kadesky, P.C.; American Comprehensive Weight Loss Center, Inc.; Littlerock Family Medicine, P.S.; Mehmet C. Pekerol M.D., P.C.; Weighless MD LLC; Lash House, LLC; North Creek Medicine Inc., P.S.; Marion Anesthesia, P.C.; Bernadette Bonaparte, M.D., P.A.; Body NV LLC; Dynamic Body Sculpting, P.C.; Sewickley Med Spa, LLC; Plastic Surgery Specialists, P.C.; Savannah Facial Plastic Surgery, LLC; and Orlando Plastic Surgery Center LLC (collectively "Plaintiffs") bring this Complaint against Defendant Cynosure, Inc. Plaintiffs allege the following based upon personal knowledge and experience, and as to all other matters upon information and belief, including investigation conducted by its attorneys:

## I.    NATURE OF THE CASE

1.      In 2015, Cynosure, Inc. began selling the SculpSure Non-Invasive Body Contouring Platform ("SculpSure") to physicians, aesthetic surgery practices, and medical spas (or "med spas") across the United States. Cynosure marketed SculpSure as an effective way for medical practices to reduce fat in a patient's midsection through the use of laser technology.

2.      As part of an aggressive campaign to induce Plaintiffs to purchase the almost $200,000 machine, Cynosure made several material misrepresentations regarding certain attributes of the SculpSure device. Cynosure claimed that, *inter alia*: (a) only one simple 25-minute treatment achieved 24% fat loss; (b) SculpSure is virtually painless and easily tolerated by the patient without pain medication or anesthesia; and (c) the procedure could be performed hands-free without a physician or trained staff member needing to be present during the majority of the treatment.

3.      But SculpSure seldom achieves results in patients after *multiple* treatments—much less so with just the single procedure Cynosure claimed would suffice. And to even have a chance at achieving results, operators must turn the power level so high that it causes intolerable pain for the patient, necessitating that the operator remain in the room to monitor patient comfort. In many cases, the operator must stop the procedure altogether.

4.      Not surprisingly, practices failed to achieve the success that Cynosure promised, and instead have found SculpSure detrimental to their business.

5.      By recommending it, practitioners risk good will, encouraging patients to pay thousands of dollars for a procedure they do not believe in themselves. A practice cannot be expected to push SculpSure to clients when the company that built the machine has knowledge that its representations are false.

6.      Performing the treatment also threatens to drain resources while taxing doctors and staff members. As the unsuccessful treatments add up, offices must futilely work with Cynosure to find a solution, deal with complaints from unsatisfied patients, and perform retreatments or alternative procedures free of charge.

7.      Finally, continuing to own the machine jeopardizes these practices' financial health. The device's failures render it incapable of recouping its significant cost—a number that continues to grow with each refund or free retreatment necessarily offered to keep customers happy.

8.      In short, Cynosure has marketed to physicians, aesthetic surgery facilities, and medical spas a costly device that has proved unusable in those very practices.

9.      SculpSure is thus effectively useless for the purpose for which it was intended. The device cannot be used in the way that Cynosure marketed it. Nor can it be used in an otherwise commercially viable manner.

10.      Plaintiffs have been in fact deceived by Cynosure's representations, did not receive the benefit of the bargain, and suffered actual damages.

## II.    PARTIES

11.      Ederra Plastic Surgery, P.C. is a Georgia professional corporation that does business as Ederra Bella Plastic Surgery at 10700 Medlock Bridge Road, Suite 104, Johns Creek, Georgia 30097. Ederra Bella provides cosmetic surgery, medical spa services, and skin care, and it bought a SculpSure in April 2017. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Ederra Bella agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Ederra Bella was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

12.      JRK Global Inc. is a Pennsylvania corporation that does business as Method Aesthetics & Wellness at 10521 Perry Highway, Suite 210, Wexford, Pennsylvania 15090. Method Aesthetics focuses on non-surgical aesthetic and wellness treatments, and it bought a SculpSure to supplement its practice in March 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Method Aesthetics agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Method Aesthetics was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

13.     Frederick A. Coville, M.D., P.C., is a New Jersey professional corporation that does business as Cornerstone Plastic Surgery & Aesthetic Medicine at 401 New Road, Suite 103, Linwood, New Jersey 08221, and it bought a SculpSure in April 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Cornerstone Plastic Surgery agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Cornerstone Plastic Surgery was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

14.     Hormonal Wellness of La Jolla, Inc. is a California corporation operating at 9850 Genesee Avenue, Suite 810, La Jolla, California 92037. Hormonal Wellness of La Jolla provides bio-identical hormone replacement therapy, and it bought a SculpSure to supplement its practice in November 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Hormonal Wellness of La Jolla agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Hormonal Wellness of La Jolla was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

15.     Treasure Coast Cosmetic Enterprises, LLC is a Florida limited liability company that does business as Ocean Med Spa at 915 SE Ocean Boulevard, Suite 5, Stuart, Florida 34994. Ocean Med Spa provides various cosmetic treatments to its patients and it bought a SculpSure in December 2015. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Ocean Med Spa agrees to submit all disputes arising out of, or

relating to, this Agreement to a court in Boston." Ocean Med Spa was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

16.     Disappearing Ink Affordable Tattoo Removal, LLC is a Pennsylvania limited liability company that does business as Disappearing Ink at 2301 Harrisburg Pike, Lancaster, Pennsylvania 17601. Disappearing Ink provides tattoo removal and other aesthetic laser treatments, and it bought a SculpSure to supplement its practice in April 2017. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Disappearing Ink agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Disappearing Ink was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

17.     Omega Aesthetics, LLC is a Georgia limited liability company that does business as Omega MedSpa. Omega MedSpa provides various cosmetic, laser, and injectable treatments, and it bought a SculpSure in September 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Omega MedSpa agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Omega MedSpa was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

18.     Georges Kaado Medicine, P.C. is a Virginia professional corporation operating at 1860 Laskin Road, Suite 110, Virginia Beach, Virginia 23454. Dr. Kaado provides various aesthetic treatments, and he bought a SculpSure in July 2016. The purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and

construed under the substantive laws of the Commonwealth of Massachusetts. Dr. Kaado agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Dr. Kaado was injured in his property and business by the actions of Defendant, as described herein, and suffered actual damages.

19.     Skin Perfect Rancho Cucamonga, Inc. is a California corporation that does business as Skin Perfect Medical Aesthetics at 10380 Foothill Boulevard, Rancho Cucamonga, California 91730. Skin Perfect provides a variety of skin care, cosmetic, and body contouring procedures, and it bought a SculpSure to supplement its practice in November 2015. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Skin Perfect agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Skin Perfect was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

20.     Yale Mitchell Kadesky, P.C. is a California professional corporation operating at 1101 East Pennsylvania Avenue, Escondido, California 92025. Dr. Kadesky provides reconstructive and plastic surgery, as well as various aesthetic treatments, and he bought a SculpSure in September 2016. The purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Dr. Kadesky agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Dr. Kadesky was injured in his property and business by the actions of Defendant, as described herein, and suffered actual damages.

21.     American Comprehensive Weight Loss Center, Inc. is a Pennsylvania corporation located at 719 East Lancaster Avenue, Downingtown, Pennsylvania 19335. American Comprehensive Weight Loss provides medical and surgical weight loss services, and it bought a SculpSure to supplement its practice in December 2015. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. American Comprehensive Weight Loss agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." American Comprehensive Weight Loss was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

22.     Littlerock Family Medicine, P.S. is a Washington professional service corporation located at 6981 Littlerock Road SW, Tumwater, Washington 98512. Littlerock Family Medicine provides general family medical care with a focus on weight loss and diabetes management, and it bought a SculpSure to supplement its practice in August 2017. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Littlerock Family Medicine agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Littlerock Family Medicine was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

23.     Mehmet C. Pekerol M.D., P.C. is a California professional corporation operating at 9201 West Sunset Boulevard, Suite 616, West Hollywood, California 90069. Dr. Pekerol provides various cosmetic, anti-aging, and laser treatments, and he bought a SculpSure in April 2016. The purchase agreement with Cynosure referred to terms and conditions that stated: "[the]

Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Dr. Pekerol agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Dr. Pekerol was injured in his property and business by the actions of Defendant, as described herein, and suffered actual damages.

24.     Weighless MD LLC is a Wisconsin limited liability company that does business as WeighLess MD and Wellness at 14960 West Greenfield Avenue, Brookfield, Wisconsin 53005. WeighLess MD and Wellness provides various weight loss and nutritional services for its patients, and it bought a SculpSure to supplement its practice in March 2017. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. WeighLess MD and Wellness agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." WeighLess MD and Wellness was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

25.     Lash House, LLC is a New Jersey limited liability company that does business as Lash House Beauty Boutique at 250 South Livingston Avenue, Livingston, New Jersey 07039. Lash House bought a SculpSure to supplement its practice in June 2017. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Lash House agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Lash House was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

26.     North Creek Medicine Inc., P.S. is a Washington professional services corporation that does business as North Creek Medicine & Aesthetics at 210 128th Street

SE, Everett, Washington 98208. North Creek Medicine provides various cosmetic, laser, and skin care treatments, and it bought a SculpSure in October 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. North Creek Medicine agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." North Creek Medicine was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

27.     Marion Anesthesia, P.C. is a Virginia professional corporation that does business at 6719 Mallard Lake Drive, Roanoke, Virginia 24018. Marion Anesthesia provides anesthesia care, and it bought a SculpSure to supplement its practice in May 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Marion Anesthesia agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Marion Anesthesia was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

28.     Bernadette Bonaparte, M.D., P.A. is a Texas professional association that provides medical services at 1601 Main Street, Suite 501, Richmond, Texas. Dr. Bonaparte focuses on internal medicine, and she bought a SculpSure to supplement the practice in August 2016. The purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Dr. Bonaparte agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Dr. Bonaparte was injured in her property and business by the actions of Defendant, as described herein, and suffered actual damages.

29.    Body NV LLC was a Nevada limited liability company that did business at 2470 Paseo Verde, Henderson, Nevada 89074; 2470 Paseo Verde, Henderson, Nevada 89074; 7455 Washington Avenue, Las Vegas, Nevada 89128; and 3860 South Hualapai Way, Las Vegas, Nevada 89147. Body NV provided SculpSure services exclusively, and it bought a SculpSure device to use in its practice in 2017. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Body NV agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Body NV was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

30.    Dynamic Body Sculpting, P.C. is a Georgia domestic professional corporation that does business at 5 Bradley Park Court, Suite 102, Columbus, Georgia 31904. Dynamic Body Sculpting provides SculpSure treatments exclusively, and it bought a SculpSure on May 22, 2017. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Dynamic Body Sculpting agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Dynamic Body Sculpting was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

31.    Sewickley Med Spa, LLC is a Pennsylvania limited liability company that does business at 2454 Mill Street, Aliquippa, Pennsylvania 15001. Sewickley Med Spa provides cosmetic treatments, and it bought a SculpSure to supplement its practice in 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be

- 10 -

governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Sewickley Med Spa agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Sewickley Med Spa was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

32.    Plastic Surgery Specialists, P.C. is a Maryland professional corporation that does business at 2448 Holly Avenue, Suite 400, Annapolis, Maryland 21401. Plastic Surgery Specialists provides cosmetic and reconstructive surgery and med spa services, and it bought a SculpSure to supplement its practice in April 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Plastic Surgery Specialists agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Plastic Surgery Specialists was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

33.    Savannah Facial Plastic Surgery, LLC is a Georgia limited liability company that does business at 5356 Reynolds Street, Suite 505, Savannah, Georgia 31405. Savannah Facial Plastic Surgery provides surgical and non-surgical cosmetic and reconstructive plastic surgery, and it bought a SculpSure to supplement its practice in July 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Savannah Facial Plastic Surgery, LLC agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Savannah Facial Plastic Surgery was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

34.     Orlando Plastic Surgery Center LLC is a Florida limited liability company that does business at 3872 Oakwood Circle, Orlando, Florida 32806. Orlando Plastic Surgery Center LLC provides cosmetic surgery, laser treatments, fillers and Botox, and skin care treatments and products, and it bought a SculpSure to supplement its practice in September 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. Orlando Plastic Surgery Center LLC agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Orlando Plastic Surgery Center LLC was injured in its property and business by the actions of Defendant, as described herein, and suffered actual damages.

35.     Defendant Cynosure, Inc. is a corporation incorporated and existing under the laws of Delaware with its principal place of business located at 5 W Carlisle Road, Westford, Massachusetts 01886. Cynosure has developed and marketed several medical devices and lasers, including SculpSure, which it has sold to medical practitioners internationally.

### III.     JURISDICTION AND VENUE

36.     This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the action lies between citizens of different states.

37.     Venue is proper because the action arises from acts and occurrences within the Commonwealth of Massachusetts; Defendant Cynosure, Inc. is headquartered in Westford, Massachusetts; and the parties agreed, via a choice-of-law provision and forum selection clause in their purchase agreements, to submit all disputes to a court in Boston, Massachusetts, subject to Massachusetts law.

## IV.    FACTUAL BACKGROUND

**A.    The noninvasive body-contouring market is a lucrative place for medical device manufacturers to compete.**

38.    Noninvasive body-contouring procedures constitute a large and rapidly growing sector of the cosmetic surgery market in the United States, with the number of treatments performed having increased by approximately 7% in 2017 compared to the previous year.[1]

39.    These procedures aim to eliminate stubborn fat from certain areas of the body. Body-contouring, however, differs from liposuction. Liposuction uses suction techniques to surgically extract fat deposits from specific areas of the body. Because liposuction requires anesthesia, it is typically an outpatient procedure at a surgery center; or, if large amounts of fat are being removed, the procedure will be done in a hospital and may require an overnight stay. Patients typically return to work after several days and to normal activities within two weeks.[2]

40.    Body-contouring, by contrast, uses noninvasive medical devices (e.g., lasers) to eliminate or shrink fat cells without an incision or anesthesia. Practitioners most commonly (and most effectively) employ it to diminish small pockets of stubborn fat and reduce the circumference of a patient's midsection and flanks. These procedures are commonly performed

---

[1] American Society of Plastic Surgeons, "2017 Cosmetic Plastic Surgery Statistics," at 2, *available at* https://www.plasticsurgery.org/documents/News/Statistics/2017/plastic-surgery-statistics-report-2017.pdf.

[2] *Liposuction*, MAYO CLINIC (Nov. 29, 2016), http://www.mayoclinic.org/tests-procedures/liposuction/home/ovc-20197272; *How to Choose Between Liposuction and Noninvasive Fat Reduction Procedures*, AM. BD. OF COSMETIC SURGERY BLOG (Aug. 19, 2015), http://www.americanboardcosmeticsurgery.org/liposuction/how-to-choose-between-liposuction-and-noninvasive-fat-reduction-procedures/; *Liposuction*, MEDINCENET, http://www.medicinenet.com/liposuction/page3.htm (last visited June 15, 2018).

in a physician's office or med spa without anesthesia and are appealing because they do not require any recovery time.[3]

41.     Body-contouring devices began appearing on the market approximately ten years ago, and several companies have developed different technologies to achieve the desired results.[4]

42.     For example, Zerona uses a low-level laser to target superficial fat cells. The laser does not destroy or kill the fat cells, but it disrupts their membranes, causing them to release their contents. The end result is that the affected fat cells shrink, causing a reduction in the belly, waist, or body size of the patient. Patients feel no pain. But because the treatment only targets superficial fat cells, it typically takes about six to twelve 40-minute treatments to achieve results.[5]

43.     Another technology, CoolSculpting, uses a process called cryolipolysis to kill fat cells. Because fat cells freeze at higher temperatures than the surrounding tissue, the CoolSculpting device can deliver cold temperatures through the skin to freeze fat cells without damaging the skin. Targeted fat cells eventually die before the body removes them through its natural processes, yielding a reduction in size in the treated area. However, because the machine works by pulling a patient's skin into the device to apply very cold temperatures, patients frequently experience discomfort for the first five to ten minutes of the procedure. The entire

---

[3] AM. BD. OF COSMETIC SURGERY BLOG, *supra* note 2; Deborah Kotz, *CoolSculpting and Zerona: Body Sculpting Without Surgery*, US NEWS & WORLD REPORT (Sept. 17, 2010), http://health.usnews.com/health-news/blogs/on-women/2010/09/17/coolsculpting-and-zerona-body-sculpting-without-surgery.

[4] AM. BD. OF COSMETIC SURGERY BLOG, *supra* note 2.

[5] *How Does the Zerona Laser Work?*, MYZERONA.COM, http://www.myzerona.com/what-is-zerona.html (last visited June 15, 2018); R. Stephen Mulholland, Malcolm D. Paul, & Charbel Chalfoun, *Noninvasive Body Contouring with Radiofrequency, Ultrasound, Cryoliolysis, and Low-Level Laser Therapy*, 38 CLINIC IN PLASTIC SURGERY 503, 514-17 (2011), *available at* http://www.invasix.com/upload/articles/peerrev_clinps_titefxmention.pdf; Kotz, *supra* note 3.

procedure takes about an hour, but unlike the Zerona procedure, CoolSculpting can often take just one visit to achieve results.[6]

**B.    Cynosure developed SculpSure to compete against other body-contouring machines.**

44.    Cynosure, located in Westford, Massachusetts, is a corporation that specializes in the marketing and sale of medical devices utilizing laser technology for cosmetic and aesthetic use. Specifically in the area of noninvasive body-contouring, Cynosure sells a device it calls "SculpSure."[7]

45.    Cynosure developed and manufactured SculpSure from its Westford offices to compete in the noninvasive body-contouring market against Zerona, CoolSculpting, and similar devices. The machine uses a laser to heat adipose tissue (loose connective tissue in which fat cells accumulate[8]) to a temperature between 42°C and 47°C. Cynosure claimed that this would cause the targeted fat cells to eventually die before being removed by the body's lymphatic system.[9]

46.    The machine has four long, flexible arms that are part of what Cynosure calls the "umbilical management system." At the end of each arm is a rectangular applicator.[10] Sample pictures follow:

---

[6] *How It Works*, COOLSCULPTING, http://www.coolsculpting.com/what-is-coolsculpting/how-it-works/ (last visited June 15, 2018); *What To Expect*, COOLSCULPTING, http://www.coolsculpting.com/what-is-coolsculpting/what-to-expect/ (last visited June 15, 2018); *FAQs*, COOLSCULPTING, http://www.coolsculpting.com/what-is-coolsculpting/faqs/ (last visited June 15, 2018); Kotz, *supra* note 3;

[7] *About Cynosure*, CYNOSURE, http://www.cynosure.com/about-cynosure/ (last visited June 15, 2018); *SculpSure*, CYNOSURE, http://www.cynosure.com/product/sculpsure/ (last visited June 15, 2018).

[8] *Adipose Tissue*, DICTIONARY.COM, http://www.dictionary.com/browse/adipose-tissue.

[9] *SculpSure*, CYNOSURE, http://www.cynosure.com/product/sculpsure/ (last visited June 15, 2018).

[10] SculpSure Operator's Manual (Rev. 4, Apr. 2016), at 12.

- 15 -



47. During the procedure, the operator arranges several plastic frames onto the patient's body in the treatment area, applies a lotion to certain areas of the patient's skin within those frames, and then attaches the rectangular applicators to the frames.[11]



48. Each applicator used during the procedure consumes one "PAC." PACs are credits that Cynosure loads onto a PAC Key. Without a sufficiently loaded PAC Key inserted into the USB port on the SculpSure, the machine will not function. Med spas and physicians must therefore purchase PAC Keys from Cynosure in advance before treating patients. As of April 2016, a PAC Key came loaded with 100 PACs and cost $5,000.[12]

---

[11] SculpSure Clinical Reference Guide (Rev. 2), at 24-28.

[12] SculpSure Operator's Manual (Rev. 4, Apr. 2016), at 36; CYNO - Q1 2016 Cynosure Inc. Earnings Call, at 3 (Apr. 26, 2016).

49.    Once the applicators are in place, the operator initiates treatment. Treatment has two phases: "build mode" and "sustain mode." Build mode occurs for the first four minutes of the procedure, during which the machine attempts to "heat[] the fat to the target temperature." Sustain mode lasts the remaining 21 minutes and aims to "maintain[] the target temperature in the fat layer."[13]

50.    The machine can deliver energy in a range of 0.90 to 1.40 Watts per square centimeter ($W/cm^2$), in increments of 0.05 $W/cm^2$. The build mode power density setting defaults to 1.10 $W/cm^2$.



51.    Despite the default setting being set to 1.10 $W/cm^2$, SculpSure directs that the operator start at a low level and increase the power, adjusting the heat based on patient feedback. Initially, Cynosure released the following Zone Adjustment Chart to guide the treatment:[14]

---

[13] SculpSure Clinical Reference Guide (Rev. 2), at 29.
[14] SculpSure Clinical Reference Guide (Rev. 2), at 32.

010674-11 1053255 V2

| Zone Score | ZONE |
|---|---|
| 1 | Pleasant cool/cold feeling.<br>Increase setting. |
| 2 | Gentle warming and cooling.<br>Increase setting. |
| 3 | Tingly, short intervals of warmth and cooling.<br>No change in setting. |
| 4 | Longer peaks of moderate deep warmth and cooling.<br>No change in setting. |
|  | Beyond Fat Destruction Zone.<br>Select Advance-to-Cool button. |

(Fat Destruction Zone spans Zone Scores 3 and 4)

52.    When the patient reports "moderate deep warmth and cooling" periods, the operator should maintain that level.[15]

53.    According to Cynosure, at this point, the operator can leave the patient in the room with a "transmitter button to page [the staff]" in the event he or she experiences heat or discomfort beyond "moderate deep warmth and cooling." The operator can then return to provide an "Advance-to-Cool" shot for temporary relief to the patient.[16]

54.    At no time during the marketing of SculpSure did Cynosure report that patients would feel pain, have to endure heat to the point of an intense burning sensation, or require any painkiller or anesthesia.

---

[15] *Id.*

[16] *Id.* at 31-32.

010674-11 1053255 V2

**C.      Cynosure aggressively markets SculpSure to physicians and practitioners as a superior device requiring only one 25-minute, pain-free treatment to achieve results.**

55.      The FDA cleared Cynosure to market its SculpSure device in mid-2015. Cynosure in turn planned to officially launch the product later that year.[17]

56.      By autumn 2015, Cynosure was engaged in a motivated campaign to sell SculpSure to various cosmetic surgery providers, med spas, and practitioners across the country. From its Massachusetts headquarters, the company developed a consistent, uniform message to distinguish SculpSure from its competitors (namely CoolSculpting). Cynosure created videos (both for the practitioners to which it marketed and for use with the practices' prospective clients), brochures, webpages, presentations, and other promotional materials reflecting that consistent message.[18] Cynosure distributed these materials to potential purchasers through its website, marketing department, and sales representatives.

57.      Specifically, Cynosure emphasized three aspects of the device critical to purchasers.

58.      First, Cynosure uniformly represented to potential buyers that patients would achieve "[d]efined success," "[m]aximal performance," or "optimal results" in one, 25-minute treatment. According to Cynosure's website and marketing brochures, just one treatment would eliminate up to 24% body fat in the treated area.[19] Before-and-after photos showed marked results from just "a single treatment in one anatomical area." And by purportedly achieving these

---

[17] *FDA Clears Expanded Use for Cynosure Lipolysis Device*, MEDICAL PRODUCT OUTSOURCING (Jul. 7, 2015), http://www.mpo-mag.com/contents/view_breaking-news/2015-07-07/fda-clears-expanded-use-for-cynosure-lipolysis-device/.

[18] *See* Cynosure Investor Event (Presentation) (Sept. 15, 2015).

[19] SculpSure, CYNOSURE.COM, https://www.cynosure.com/product/sculpsure/ (last visited Aug. 17, 2017); SculpSure Product Presentation (Nov. 2015), at 8.

end results in only 25 minutes, Cynosure had a straightforward way to distinguish its product from CoolSculpting:[20]



59.    This efficiency was particularly attractive to buyers. If the procedure truly took 25 minutes, those who owned a SculpSure could perform more treatments in a day without having to tax their staff, hire more employees, or perform follow-up with the patient. Furthermore, the minimal time commitment provided practices with a key marketing tool to convince patients to opt for the procedure, especially when compared to SculpSure's existing competitors.

60.    Second, Cynosure stressed that the procedure would be a comfortable and pain-free experience for patients, despite the fact that SculpSure utilized very high temperatures to eliminate the fat cells.

61.    According to Cynosure, SculpSure's "Contact Cooling" system would "assist in maintaining safe and comfortable skin surface temperatures." At the proper setting, Cynosure claimed that SculpSure would cause no more than "long[] peaks of moderate deep warmth and

---

[20] SculpSure Product Presentation (Nov. 2015), at 7, 12-44.

cooling."[21] Cynosure's marketing materials assured that "[m]ost patients feel a tingling sensation intermittently which is well tolerated"[22] and "[c]omfortable."[23] To demonstrate the tolerability of the procedure, Cynosure marketing videos showed women casually using cell phones, tablets, or e-readers during the procedure without any visible signs of discomfort and without any staff present in the room to monitor them.[24] Consistent with these representations, Cynosure also held live demonstrations at various promotional events where a model would sit and supposedly receive the treatment while talking to audience members to illustrate how painless the procedure was.

62.     To compare, CoolSculpting's suction mechanism and intense cold meant patients would have to endure at least a few minutes of discomfort during the procedure. So SculpSure offered the promise of attracting those patients who may be more hesitant to body contouring.

63.     Third, Cynosure promoted the device as "hands-free,"[25] including a pager system with the device that would allow staff to "leav[e] the treatment room" but still communicate with patients. In its manual, Cynosure noted that a patient could use the transmitter to request "a magazine or water" during the treatment even though the staff member may not be in the room.[26] And in online promotional videos, Cynosure showed patients being left alone in the treatment room after only a few minutes:[27]

---

[21] SculpSure Clinical Reference Guide (Rev. 2), at 9, 32.

[22] SculpSure Marketing Brochure (2015), at 2.

[23] SculpSure Product Presentation (Nov. 2015), at 8.

[24] *See, e.g.*, DocWeb, *SculpSure – Head to Head Treatment,* YOUTUBE (Jan. 16, 2016) https://www.youtube.com/watch?v=Def18hMKFzI (last visited June 15, 2018).

[25] Cynosure Investor Event (Presentation) (Sept. 15, 2015).

[26] SculpSure Operator's Manual (Rev. 4, Apr. 2016), at 35.

[27] DocWeb, *SculpSure – Head to Head Treatment,* YOUTUBE (Jan. 16, 2016), https://www.youtube.com/watch?v=Def18hMKFzI (last visited June 15, 2018).



64.    If staff could leave the room, they could utilize their time more efficiently,

assisting other patients, taking care of paperwork, or even performing a separate procedure.

Potential purchasers naturally found this potential aspect of the device appealing.

65.    All told, Cynosure's efforts to sell the machine promoting these supposed

qualities were successful.[28] Cynosure has sold hundreds of SculpSures since 2015, with

---

[28] *See* CYNO - Q1 2016 Cynosure Inc. Earnings Call, at 3 (Apr. 26, 2016) ("By virtually every measure SculpSure continues to exceed our expectation."); CYNO – Q2 2016 Cynosure Inc. Earnings Call, at 3 (Jul. 26, 2016) ("Revenue for the quarter increased to a record $110.3 million, 32% higher than the year-over-year period. The primary contributors to the top-line results were SculpSure, our exciting new hyperthermic laser treatment for noninvasive fat reduction . . . ."); CYNO – Q3 2016 Cynosure Inc. Earnings Call, at 3 (Oct. 25, 2016) ("I will now update you on SculpSure, which has generated meaningful revenue for the past four full quarters and continues to outperform our expectations."); CYNO – Q4 2016 Cynosure Inc. Earnings Call, at 3 (Feb. 07, 2017) ("SculpSure, one full year into its launch, remains ahead of our expectations. Q4 set the high watermark for SculpSure placements in a single quarter.").

approximately 350 in the vicinities of five cities (Boston, Los Angeles, Miami, Chicago, and New York City) alone.[29]

66.    Hologic, Inc., who acquired Defendant for approximately $1.44 billion in early 2017, consistently singled out SculpSure when discussing the basis for the massive acquisition of the company.[30]

**D.    SculpSure does not work as represented, rendering the product effectively useless for practitioners and physicians.**

67.    Nevertheless, Cynosure's representations about SculpSure proved to be false. In short, Cynosure misrepresented SculpSure's capability as a simple, one-and-done treatment without pain.

68.    From the onset, patients failed to achieve results from SculpSure despite being treated as directed using Cynosure's Zone Adjustment Chart. Recognizing the problem, Cynosure subsequently revised its treatment protocol for SculpSure. In mid-2016, Cynosure introduced a "Treat to Complete" treatment plan, advising doctors to manage a patient's "expectations that multiple treatments may be part of the treatment plan."[31] Yet the "Treat to Complete" protocol directly contradicted Cynosure's marketing of SculpSure as a one-time, 25-minute treatment—with the latter message still advertised today on Cynosure's website.[32]

69.    Furthermore, Cynosure directed physicians and practitioners to raise the power levels on the machine to compensate for poor results, contradicting prior claims that any setting between 0.9 and 1.4 W/cm$^2$ would suffice. Cynosure even suggested that once patients appear to

---

[29] *See Patients*, CYNOSURE, http://patients.cynosure.com/ (searching for SculpSure machines located within 100 miles of the following zip codes: 02201, 90001, 33018, 60611, and 10018).

[30] HOLX – Hologic Inc. to Acquire Cynosure Inc. Conference Call, at 4, 6-7, 9 (2017).

[31] SculpSure Clinical Reference Guide (Rev. 4, Apr. 2016), at 15.

[32] SculpSure, CYNOSURE.COM, https://www.cynosure.com/product/sculpsure/ (last visited June 15, 2018) (claiming that a "single treatment" provided "[d]efined success" with an "[a]verage reduction in fat volume" of "[u]p to 24%").

have reached the threshold level they can tolerate, the operator should then "bump" the setting higher without the patient's knowledge.

70.     But even at lower power levels, many experienced excruciating pain. Practitioners reported that patients would jump off the treatment table, howl in agony, or even demand the operator stop the machine because they could not tolerate the procedure. Such circumstances paint a far different picture than the so-called "tingling sensation[s]" that Cynosure claims are "well-tolerated."[33]

71.     The patient experience also makes it impossible for the operator to leave the treatment room and renders the pager system on the device useless. In practice, the procedure requires practitioners to stay in the room for the entire 25 minutes; thus, Cynosure's promise of a hands-free treatment is untrue. Operators constantly need to adjust the device's levels, provide "Advance to Cool" shots, or coach patients through the pain.

72.     Nor can practices simply administer anesthesia to make the procedure more bearable. The treatment requires feedback from patients to determine the appropriate energy level. If patients lack the ability to feel any pain or excessive heat in the treated area, then they cannot provide the necessary response to the doctor to lower the power level on the machine. Moreover, administering anesthesia would render the procedure inappropriate for med spas or other medical offices—the very practices for whom SculpSure was designed and to which it was marketed. And anesthesia, or even a strong oral analgesic, would require time before the procedure to administer it, downtime after the treatment to allow the patient to recover, and a doctor to monitor the patient to make sure he or she was fit to leave, any of which would render the promise of a 25-minute procedure false.

---

[33] SculpSure Marketing Brochure (2015), at 2.

73.     Given patients' painful experiences with the treatment, Cynosure had to update its Zone Score Adjustment Chart on multiple occasions. Initially, Cynosure claimed that a power level correlating with "[t]ingly, short intervals of warmth and cooling" in the patient would result in "fat destruction." Yet by April 2016, it removed that claim. And but a few months later, Cynosure changed the chart again. This time it maintained that results would require "[p]rickling, pinching, pressure, [and] longer peaks of moderate deep heat and cooling"[34]—an artful, yet still erroneous description of the distress many patients experienced. And the description completely contradicts the one advertised by Cynosure on its website: a "comfortable," "gentle, warming sensation" that "fl[ies] right by."[35]

---

[34] *Compare* SculpSure Clinical Reference Guide (Rev. 2), *with* SculpSure Clinical Reference Guide (Rev. 4, Apr. 2016), *and* SculpSure Clinical Reference Guide (Rev. 7, Nov. 2016).

[35] SculpSure, CYNOSURE.COM, https://www.cynosure.com/product/sculpsure/ (last visited Aug. 17, 2017).

010674-11 1053255 V2

Rev. 2 (2015)

| Zone Score | ZONE |
|---|---|
| 1 | Pleasant cool/cold feeling. Increase setting. |
| 2 | Gentle warming and cooling. Increase setting. |
| 3 | Tingly, short intervals of warmth and cooling. No change in setting. |
| 4 | Longer peaks of moderate deep warmth and cooling. No change in setting. |
| | Beyond Fat Destruction Zone. Select Advance-to-Cool button. |

Fat Destruction Zone (rows 3–4)

Rev. 4 (April 2016)

| Zone Score | ZONE |
|---|---|
| 1 | Pleasant cool/cold feeling. Increase setting. |
| 2 | Gentle warming and cooling. Increase setting. |
| 3 | Tingly, short intervals of warmth and cooling. Increase setting. |
| 4 | Longer peaks of moderate deep warmth and cooling. No change in setting. |
| | Beyond Fat Destruction Zone. Select Advance-to-Cool button. |

Fat Destruction Zone (row 4)

Rev. 7 (August 2016)

| Zone Score | ZONE |
|---|---|
| 1 | Pleasant cool/cold feeling. Increase setting. |
| 2 | Gentle warming and cooling. Increase setting. |
| 3 | Tingly, short intervals of warmth and cooling. Increase setting. |
| 4 | Prickling, pinching, pressure, longer peaks of moderate deep heat and cooling. No change in setting. |
| | Beyond Fat Destruction Zone. Select Advance-to-Cool button. |

Fat Destruction Zone (row 4)

74.     Ultimately, the situation has left practices in an impossible position. They have spent hundreds of thousands of dollars on a machine that does not work as Cynosure represented. At the same time, they lack the ability to recoup that cost; practices cannot continue to recommend a cosmetic procedure to their patients knowing that it is likely to involve several painful treatments and unlikely to be effective.

**E.      Cynosure misrepresented SculpSure's attributes to Plaintiffs, which have been damaged because SculpSure is unfit for its intended purpose.**

**1.      Ederra Plastic Surgery, P.C. d/b/a Ederra Bella Plastic Surgery**

75.     A new practice that opened in January 2016, Ederra Bella Plastic Surgery is owned and run by Myla Bennett, M.D., and operates in Johns Creek, Georgia.

76.    Prior to the practice's purchase of SculpSure, Chris Cononi of Cynosure visited the fledgling practice multiple times, pitching SculpSure's benefits versus its main competitor, CoolSculpting. Cononi emphasized that, *inter alia*:

      a.    SculpSure was "just as effective" but without any of the drawbacks of CoolSculpting;

      b.    SculpSure treatment resulted in "no pain" to patients;

      c.    SculpSure required a shorter treatment time;

      d.    SculpSure provided a 20-30% fat reduction per treatment;

      e.    the cost of the SculpSure consumable PAC Keys was lower than CoolSculpting; and

      f.    the device was hands-free, permitting staff to leave the room during the treatment.

77.    Based on these and other representations from Defendant, Dr. Bennett agreed to purchase a SculpSure in April 2017 for $173,000, financing the purchase with a monthly payment of $3,560.00.

78.    Treating patients with SculpSure proved problematic from the onset. The problems that Ederra Bella encountered included, but were not limited to the following:

      a.    patients routinely found the treatment intolerable;

      b.    a staff member was required to sit with the patient throughout the duration of the procedure to adjust the settings and coach the patient through any pain;

      c.    patients could not tolerate the higher settings;

- 27 -

      d.       while Dr. Bennett attempted to use oral sedation to improve tolerability, sedation required patients to have someone drive them to and from the procedure; and

      e.       the treatments failed to deliver adequate results.

79.     Further, Cynosure did not inform Dr. Bennett of the "Treat to Complete" protocol until after she purchased the device. The protocol required Dr. Bennett to sell multiple treatments in packages to patients up front at a discounted rate. However, Defendant did not discount the consumable cost to the practice in the form of PAC Keys. Thus, the consumable cost was not lower than CoolSculpting, due to the need to use multiple cycles to treat the same amount of surface area. As a result, Plaintiff's ability to turn a profit was drastically impacted.

80.     Ederra Bella complained to Cynosure but the company refused to offer any remedy.

81.     Because of SculpSure, the practice has lost customers and has needed to offer free treatments to keep unsatisfied patients happy. Due to these issues, Ederra Bella has stopped offering the treatment to its customers and cannot recoup the cost of the device.

82.     The SculpSure purchase has placed serious strain on the practice. Ederra Bella has had to lay off staff to cover its monthly financing payment for the SculpSure device. The money Ederra Bella spent on the SculpSure device has been a wasted investment and the financial burden remains.

83.     Ederra Bella has suffered actual damages arising out of Defendant's misrepresentations and its purchase of SculpSure.

2.      **JRK Global Inc. d/b/a Method Aesthetics & Wellness**

84.      Katalin Reimann has owned and operated Method Aesthetics from its location in Wexford, Pennsylvania, since January 2014. The practice offers a variety of aesthetic and wellness treatments to its clients.

85.      In January 2016, Reimann received an invitation to an event in New York City promoting SculpSure. Reimann attended the event, which featured several speakers, on March 19, 2016. During the event, she was placed in a room with five people, including Joe Amon and other representatives from Cynosure.

86.      There, Cynosure representatives promised 24% fat reduction in one comfortable, 25-minute treatment.

87.      Reimann stressed that she could not sell a procedure to her clients if it caused any physical pain, after which the representatives assured her it was "painless."

88.      Reimann asked if Cynosure could prove it by treating her abdomen. To demonstrate, a Cynosure trainer attached Reimann to the device and began to treat her. After just a few minutes, the trainer stopped the device and claimed she needed to leave. The trainer did not explain that the device had not yet reached full treatment levels, leading Reimann to believe the procedure would be relatively painless.

89.      Based on Cynosure's representations, Method Aesthetics purchased SculpSure for $177,352.50, financing the purchase over 60 months with a monthly payment of $4,895.00.

90.      But Method Aesthetics' experience with the device did not coincide with that described by Cynosure representatives. The problems Plaintiff encountered included but were not limited to the following:

a.    clients routinely complained of excessive heat and pain with the treatment, including two clients who sent emails describing the procedure as "torture";

b.    clients expressed anger and dissatisfaction with the treatment and results; and

c.    as many as fifteen clients have refused to come back to her practice and have since sought aesthetic treatments from competitors.

91.    In an attempt to protect her reputation, Reimann had to issue refunds or offer free alternative treatments to unhappy clientele.

92.    Reimann sought help from Cynosure about how to make the device work for her practice, but was merely told that "different people feel the treatment differently." With little guidance from Cynosure, Method Aesthetics had to cease offering SculpSure to patients.

93.    The financial burden associated with the device remains, however. Method Aesthetics has had to lay off staff members to avoid defaulting on the loan or going out of business.

94.    Method Aesthetics has suffered actual damages arising out of Defendant's misrepresentations and its purchase of SculpSure.

**3.    Frederick A. Coville, M.D., P.C. d/b/a Cornerstone Plastic Surgery & Aesthetic Medicine**

95.    Dr. Frederick A. Coville, a plastic surgeon, owns and operates Cornerstone Plastic Surgery & Aesthetic Medicine in Linwood, New Jersey. The practice provides a number of plastic surgery and cosmetic procedures, including facial rejuvenation, laser hair removal, injectibles, and laser skin resurfacing.

96.      In October 2015, Joe Amon of Cynosure contacted Dr. Coville and invited him to a Cynosure event in Philadelphia featuring Barry DiBernardo, John Decorato, and Evan Sorokin. At the event—and in later conversations with Joe Amon and Andy Acaru—Cynosure represented that SculpSure would "destroy" its competitors because it:

        a.     offered a shorter treatment that was painless;

        b.     achieved better results without side effects;

        c.     only required one treatment to get desired results;

        d.     could be run without a staff member being present in the room;

        e.     would "pay for itself" in a few months given that the consumable costs were lower than that of competitors;

        f.     would benefit from Cynosure's aggressive direct-to-consumer marketing campaign; and

        g.     would result in increased patient satisfaction to help grow the practice.

97.    Based on these representations, in April 2016, Dr. Coville purchased a SculpSure for his office for $165,000, financing the device over 60 months with a monthly payment of $3,719.22.

98.    Cornerstone's experience with SculpSure, however, didn't match Cynosure's bold claims. Immediately, many of its patients endured significant pain from SculpSure. Because of this, Dr. Coville had to dedicate a staff member to sit with the patient the entire time, increasing the per treatment cost to the practice and contradicting Cynosure's promise of a "hands-free" procedure.

99.    For patients who originally considered treating multiple areas, the pain from the first treatment convinced them not to proceed with any additional treatments.

100.    Cornerstone's patients also saw little-to-no results from SculpSure. The vast majority of its patients complained about their results, and not a single patient claimed to be particularly satisfied. Cornerstone had never experienced such a negative response to any treatment it previously offered.

101.    When Cornerstone complained to Austin Monroe of Cynosure about these issues, Monroe assured the practice that no one else had been having a similar experience. Monroe proposed another training session with Cornerstone's staff.

102.    But the second training did not offer any different approach to the treatment itself; instead, Cynosure simply used the training to reveal the "Treat to Complete" protocol.

103.    The new protocol, however, failed to resolve the issues. Patients still endured pain during their treatments and did not see results. Moreover, patient dissatisfaction increased because patients had to invest more time and money into the multiple treatments.

104.     Over time, Cornerstone's staff completely lost faith in SculpSure. In addition to patient complaints, staff members received the treatment and were displeased with the experience and results.

105.    Cornerstone could not continue to recommend that its patients endure a painful, expensive treatment rejected by its own staff. Because the practice did not want to further jeopardize its reputation, it was forced to stop offering SculpSure to its patients.

106.    Cornerstone has lost time, money, and patients on account of SculpSure. Cornerstone has:

    a.    refunded or offered free liposuction to unhappy customers;

    b.    lost patients, some of whom told their friends to seek services elsewhere;

    c.    spent thousands on marketing for a service it cannot sell; and

- 32 -

    d.      continues to pay nearly $4,000 per month in payments on the device,

            making it impossible to expand the business or acquire another device.

107.    Cornerstone Plastic Surgery has suffered actual damages arising out of Defendant's misrepresentations and its purchase of SculpSure.

### 4.    Hormonal Wellness of La Jolla, Inc.

108.    Hormonal Wellness of La Jolla operates in La Jolla, California, under the supervision of its owner, Ryan Dominguez, M.D.

109.    On November 29, 2016, Dr. Dominguez and his wife, Cat Dominguez, the Clinical Director at the time, met Alex Yeats of Cynosure for dinner at the restaurant Seasons 52 in La Jolla, California. At the meeting, Yeats claimed that:

    a.      Cynosure would put CoolSculpting out of business with SculpSure;

    b.      only one 25-minute treatment was needed to get a good result of approximately 24% with SculpSure;

    c.      SculpSure was a "walk away" procedure—easy to operate and comfortable enough for the patient that the operator need not remain present for the treatment; and

    d.      SculpSure treatment resulted in minimal, if any discomfort.

110.    Based on these representations, Hormonal Wellness of La Jolla purchased a SculpSure for $180,750.00, financing the device over 60 months with a monthly payment of $4,329.95.

111.    Immediately, the practice encountered issues while treating patients. Many patients experienced significant pain and excessive heat with SculpSure, such that the treatment levels had to be turned down. Patients also complained that they were not seeing results. One

patient developed nodules as a result of the SculpSure treatment, which have yet to resolve 18 months later.

112.    The practice received multiple trainings on SculpSure. At one of these trainings, Mrs. Dominguez was told for the first time that Cynosure recommended two SculpSure treatments on one area. At a later training, focused on protocol for treating the inner thigh area, Mrs. Dominguez was told that Cynosure recommended four treatments rather than two.

113.    Mrs. Dominguez attempted to work with Cynosure to improve treatment outcomes. Cynosure's recommendations were impossibly contradictory. It recommended that the practice *increase* the energy to as high as possible and stay in "Zone 4" of the Zone Score to improve results, while also recommending that the practice *decrease* the energy to improve tolerability for the patient. This contradictory advice put the operator in a lose-lose situation: either sacrifice patients' comfort to the point of pushing them to the limits of their pain threshold, or compromise the result that patients paid thousands hoping to achieve.

114.    Cynosure's recommendations did not improve patient satisfaction or treatment outcomes. The SculpSure treatment remained painful and ineffective. Some patients were prescribed over-the-counter pain medication in an attempt to tolerate their pain. In some cases, this medication was ineffective at reducing the pain and stronger pain medication was prescribed. For these patients, extra arrangements had to be made for safe transportation to and from Hormonal Wellness' office. Some patients who were supposed to receive multiple treatments never bothered to show up for their subsequent appointments on account of their poor initial experience.

- 34 -

115.    Patients who had been seeing Dr. Dominguez for years decided to no longer return. Some explained that they felt betrayed or disappointed that he recommended the procedure. Ultimately, the practice ceased treating patients with the device.

116.    The SculpSure purchase has placed serious strain on the practice. The aesthetic line of the business has ceased operating altogether. The practice had to lay off staff. The amount spent on the device has proven to be a wasted investment, and the financial burden remains.

117.    Hormonal Wellness of La Jolla has suffered actual damages arising out of Defendant's misrepresentations and its purchase of SculpSure.

**5.    Treasure Coast Cosmetic Enterprises, LLC d/b/a Ocean Med Spa**

118.    Ocean Med Spa provides laser hair removal, electrolysis, cosmetic injections and other aesthetic treatments in Stuart, Florida. It is owned and operated by Robert Fier, M.D.

119.    At a 2015 conference in Orlando, Florida, Dr. Fier attended a SculpSure presentation by Dr. R. Stephen Mullholland and other Cynosure representatives, as well as a demonstration. Cynosure represented that SculpSure:

      a.    had exceptionally high patient satisfaction rates of 95%;

      b.    provided noticeable results after just one treatment, showing before-and-after pictures on slides; and

      c.    was easy to operate and painless to the patient, using a SculpSure device to demonstrate.

120.     In later meetings, Matt Carron of Cynosure characterized SculpSure as "one-and-done," as it could achieve 30% fat reduction in the treated area in just one 25-minute treatment. He also described it as "virtually painless."

121.    Based on these representations, in December 2015, Ocean Med Spa purchased a SculpSure for $160,648.73, financing the device over 60 months for $3,461.41 per month.

122.    Ocean Med Spa initially began treating patients with the "one-and-done" protocol. Repeatedly, however, patients did not demonstrate adequate results and complained of significant pain. In response, the practice issued refunds or retreated many patients for free.

123.    The practice complained to Cynosure about the poor treatment outcomes, but Cynosure's solution was to keep adding treatments. Initially, in response to the complaints, Cynosure recommended that Ocean Med Spa treat patients twice to get better results. By late 2017, Cynosure advised Ocean Med Spa that each patient would likely require three or four treatments—and possibly more—to get the desired outcome.

124.    All of these issues made the treatment difficult to administer and difficult to sell to patients. Increasing the number of treatments per patient meant that the practice had to significantly reduce its profit margins, spending more on consumables and staff while also charging significantly less per treatment.

125.    Ocean Med Spa has ceased treating patients altogether. It spent significant time and money attempting to make SculpSure work, in addition to the amounts spent promoting the device. The reputations of Ocean Med Spa and Dr. Fier have been harmed, as word travels fast in the small town where the office is located. As a result of the poor reviews and negative feedback, the practice has experienced financial peril from SculpSure and has contemplated bankruptcy.

126.    Ocean Med Spa has suffered actual damages arising out of Defendant's misrepresentations and its purchase of SculpSure.

### 6.    Disappearing Ink Affordable Tattoo Removal, LLC d/b/a Disappearing Ink

127.    Bonnie Fissella owns and operates Disappearing Ink in Lancaster, Pennsylvania. Disappearing Ink provides tattoo removal and other laser aesthetic treatments.

128.     In January 2017, a Cynosure representative, Sean Betesh, called Disappearing

Ink's offices to set up a meeting with Ms. Fissella to discuss SculpSure. At that meeting, Betesh

and Joe Amon, also of Cynosure, represented that:

        a.     SculpSure was a "painless," 25-minute laser procedure that eliminates up

               to 24% of body fat in the treated area;

        b.     Cynosure would provide marketing; and

        c.     the practice would generate thousands in revenue from new customers,

               providing purported recommendation letters from other practices that had

               purchased SculpSure.

129.     Disappearing Ink also received several calls while it was contemplating

purchasing SculpSure. These calls—something Disappearing Ink had never received before it

had discussed SculpSure with Cynosure—were supposedly from prospective patients inquiring

whether the practice offered the procedure. After Disappearing Ink purchased the product,

Cynosure's sales representative admitted that these calls were generated by Cynosure.

130.     Based on Cynosure's representations, in April 2017, Ms. Fissella purchased a

SculpSure for $125,000.

131.     Disappearing Ink immediately encountered problems, including but not limited to

the following:

        a.     patients complained about how much the procedure hurt;

        b.     despite being treated several times, patients saw little, if any, results; and

        c.     none of the prospective patients who called Disappearing Ink while

               Ms. Fissella contemplated purchasing SculpSure answered their phones or

               called back. And these phone inquiries stopped immediately after

Disappearing Ink purchased the device. Betesh later admitted to
Ms. Fissella that Cynosure encouraged sales representatives to have their
friends or family members make fake calls to potential buyers inquiring
about the procedure.

132.    Given that SculpSure caused pain in its patients and failed to work, Disappearing
Ink has stopped offering the procedure to its clients and now owns a useless device for which the
practice cannot recoup the large purchase price.

133.    Disappearing Ink has suffered actual damages arising out of Defendant's
misrepresentations and its purchase of SculpSure.

**7.    Omega Aesthetics, LLC d/b/a Omega MedSpa**

134.    Betsy Horton-Pawlowski, M.D. owns and operates Omega MedSpa, which
provides various aesthetic medical treatments from its location in Fayetteville, Georgia.

135.    Dr. Horton-Pawlowski first learned of SculpSure after attending a Cynosure
seminar in Atlanta, Georgia, in the fall of 2015. At the event and during later conversations with
sales representative Dominic Amaral, Cynosure described SculpSure as a "painless" treatment
that would achieve 25% permanent fat reduction in the treated area. According to Cynosure, only
one 25-minute treatment was necessary.

136.    Based on these representations, Omega MedSpa purchased a SculpSure for
$169,600, financing the purchase price through Ascentium Capital over 66 months.

137.    In practice, Omega MedSpa's experience treating patients did not coincide with
Cynosure's promises:

a.    the majority of patients experienced pain during the treatment, some to the
point that they couldn't even finish the full 25 minutes; and

b.    results have been completely unsatisfactory.

- 38 -

138.    Omega MedSpa understands that it may have to treat patients at least three times to see any results. Because patients are unlikely to desire a procedure that requires three separate painful treatments, Omega MedSpa was required to lower its price to sell SculpSure to patients. The increased number of treatments affected Omega MedSpa's revenues because the cost of consumable PAC Keys and overhead were not also reduced.

139.    Despite several complaints to the company, Cynosure offered no solution. Thus, Omega MedSpa has stopped offering SculpSure to its patients.

140.    SculpSure has done significant harm to Omega MedSpa's business. It spent significant capital to make the treatment work. It has lost customers and had to issue refunds or provide alternative procedures to others. The practice has nearly gone bankrupt due to the financial strain.

141.    Omega MedSpa has suffered actual damages arising out of Defendant's misrepresentations and its purchase of SculpSure.

**8.    Georges Kaado Medicine, P.C.**

142.    Fouad Georges Kaado, M.D. runs his medical practice in Virginia Beach, Virginia, and provides various cosmetic medical procedures to his patients.

143.    In the spring of 2016, Sam Cooper of Cynosure visited Dr. Kaado's offices to pitch SculpSure to the practice. Cooper described SculpSure as "quick and painless," representing that patients needed only one 25-minute session to achieve a 24% reduction in body fat in the treated area.

144.    Based on these representations, on July 27, 2016, Dr. Kaado purchased a SculpSure for $155,000, financing the device over a 66-month period.

145.    Problems surfaced immediately. Many patients could not tolerate the procedure, complaining of excessive heat and pain. Some asked the operator to stop the treatment. Patients

- 39 -

and staff expressed disappointment with poor or nonexistent results. To retain clients, Dr. Kaado often had to refund patients or offer complimentary services.

146.    Despite requests for support, Cynosure did nothing to resolve the issues. With no solution, Dr. Kaado ceased providing SculpSure treatments to his patients.

147.    The harm to his practice, however, remains. Dr. Kaado has lost customers, suffered harm to his reputation, and been unable to pursue other business opportunities or purchase other devices while he continues to make monthly payments on SculpSure.

148.    Dr. Kaado has suffered actual damages arising out of Defendant's misrepresentations and its purchase of SculpSure.

**9.    Skin Perfect Rancho Cucamonga, Inc. d/b/a Skin Perfect Medical Aesthetics**

149.    Owned and operated by Dr. Gideon Kwok, Skin Perfect Medical Aesthetics provides a variety of medical aesthetic and skin care treatments to patients in Rancho Cucamonga, California.

150.    Alex Yeats, a sales representative from Cynosure, told Dr. Kwok that SculpSure:

a.    would provide a single, 25-minute treatment that was "virtually painless";

b.    would result in a 24% fat reduction after one treatment, claiming that SculpSure would have the same efficacy as its main competitor, CoolSculpting;

c.    would allow for treatment at lower power settings to accommodate patient comfort without sacrificing results; and

d.    was a "set it and forget it" procedure, such that a non-licensed practitioner could operate the unit, set up the patient, and leave the room until the treatment finished.

- 40 -

151.    Cynosure also promised Skin Perfect territorial exclusivity within a certain radius of its office.

152.    Based on these representations, Skin Perfect purchased a SculpSure for $165,750, financing the purchase over 66 months with a monthly payment of $3,715.

153.    Cynosure's representations proved untrue from the start. Most patients expressed dissatisfaction with the treatment. Few, if any, achieved noticeable results and many experienced intolerable pain during the treatment. Many patients experienced a significant amount of adverse effects due to SculpSure. Many patients developed hard nodules under the surface of the skin, visible to the naked eye. One patient had to be treated after the SculpSure treatment for over nine months with therapies in order to attempt to reduce the size of the nodules.

154.    Skin Perfect sought help from Cynosure, but Cynosure acted surprised that Skin Perfect was struggling and claimed other practices were thriving. Cynosure's solution was merely to retrain the staff. But Skin Perfect knew Cynosure's explanation to be false, as similar complaints from other practices in the industry about SculpSure grew in number.

155.    Cynosure eventually changed the treatment protocols, telling Skin Perfect to treat patients several times and to turn up the treatment settings as high as the patient can tolerate. Yet Cynosure's proposed solutions negated all of the main reasons Skin Perfect bought the device. The treatment was no longer a one-time, 25-minute, painless, hands-free treatment that Skin Perfect could recommend to patients without reservation. Instead, it was a less profitable series of painful treatments that required a trained professional to remain in the room to continually adjust energy levels and coach the patients through the pain.

156.    After attempting for over a year to make the treatment work, Skin Perfect lost confidence in the procedure and stopped offering SculpSure to patients. It could no longer afford

to lose customers, contend with bad reviews, or issue refunds or free treatments. The monthly payments continue to burden the finances of the company.

157.     Skin Perfect has suffered actual damages arising out of Defendant's misrepresentations and its purchase of SculpSure.

**10.     Yale Mitchell Kadesky, P.C.**

158.     Dr. Yale M. Kadesky operates a plastic surgery and aesthetic medical practice in Escondido, California.

159.     In 2016, Alex Yeats of Cynosure pitched SculpSure to Dr. Kadesky, describing a SculpSure treatment as:

> a.     a "painless" procedure that would eliminate 24% body fat in a single, 25-minute treatment; and
>
> b.     a "lunchtime procedure" that was easy to use, such that the staff member operating the machine could leave the room during the treatment.

160.     Based on these representations, in September 2016, Dr. Kadesky purchased a SculpSure device for $165,000.

161.     Dr. Kadesky's experience with SculpSure did not comport to Cynosure's representations. Most patients complained about the pain being practically unbearable, making it difficult for the operator to advance the treatment to higher settings. The practice had to refund several patients or offer them liposuction at a significantly reduced cost because they had not seen any results. When Dr. Kadesky sought patient feedback via a survey, patients called SculpSure "a ripoff" and "very painful," and complained of "no change" and "no results." The vast majority of patients were dissatisfied.

162.    Dr. Kadesky complained to Cynosure representatives every time they visited his offices. Cynosure's only solution to improve results was to provide "more training." Over 22 months, Cynosure sent four different nurses to train Dr. Kadesky's staff.

163.    Cynosure also encouraged Dr. Kadesky to increase marketing the procedure to obtain more patients, ignoring Dr. Kadesky's stated concern that he could not continue to invest money in marketing and encourage patients to undergo a procedure without being able to improve the treatment outcomes.

164.    After considerable complaints, lost customers, and multiple refunds, Dr. Kadesky's practice ceased providing SculpSure to patients. Because it must continue to make sizeable monthly payments on the loan, SculpSure remains a financial burden to the practice.

165.    Dr. Kadesky has suffered actual damages arising out of Defendant's misrepresentations and its purchase of SculpSure.

**11.    American Comprehensive Weight Loss Center, Inc.**

166.    Dr. Lisa Medvetz owns and operates American Comprehensive Weight Loss Center in Downingtown, Pennsylvania. The practice provides medical and surgical weight loss options for its patients.

167.    In late 2015, Dr. Medvetz received an email from Cynosure inviting her to an event in Philadelphia; Dr. Medvetz sent her office manager. At the event—and in later meetings with sales representative Tom Brown—Cynosure represented that SculpSure:

      a.    was a single, pain-free, 25-minute treatment;

      b.    would have similar or better efficacy than its competitors, claiming a 24% fat reduction after one treatment; and

      c.    was a hands-free treatment, allowing the operator leave the room after only a few minutes.

168.    Cynosure's Tom Brown claimed that most practices were making $30,000 in revenue every month from the treatment. He also said that Cynosure could provide them with financing through Heartland Business Credit, for which there would be a six-month grace period and no prepayment penalty. Finally, Cynosure promised to market the device directly to consumers for Dr. Medvetz's practice.

169.    Based on these representations, in December 2015, American Comprehensive Weight Loss purchased a SculpSure for approximately $160,000.

170.    Little of what Cynosure represented turned out to be true, including the following:

   a.    patients did not see results and found the treatment painful;

   b.    Cynosure failed to provide consumer marketing support;

   c.    Cynosure's Austin Moore admitted that the extent of Cynosure's direct-to-consumer marketing budget had been spent on a billboard in Times Square in New York City as well as on parties; and

   d.    the promises of a six-month grace period and no prepayment penalty also ended up being false.

171.    Being unable to generate revenue from SculpSure, American Comprehensive Weight Loss in turn could not pay Heartland the several thousand dollars it owed each month. Eventually, the severe financial strain from SculpSure required American Comprehensive Weight Loss and Dr. Medvetz to sell assets to satisfy the debt owed to Heartland. As a result, American Comprehensive Weight Loss is going out of business.

172.    American Comprehensive Weight Loss has suffered actual damages arising out of Defendant's misrepresentations and the purchase of SculpSure.

12.    **Littlerock Family Medicine, P.S.**

173.    Dr. Kirk Harris owns Littlerock Family Medicine in Tumwater, Washington. The practice provides general family medical care with a focus on weight loss and diabetes management.

174.    Over the course of multiple visits to the practice in 2017, Jason Kelso of Cynosure represented that SculpSure:

a.    was more effective than CoolSculpting, eliminating fat pockets in the treated area by 24%;

b.    was "painless"; and

c.    could be operated "hands-free," so that the operator could leave the patient in the treatment room alone during the procedure.

175.    Kelso did not disclose that (i) the machine would require PAC Keys—at $3,500 per key—to operate the machine; or (ii) the "discounted" PAC Key price would only be available if the practice purchased a new $3,500 PAC Key every two months.

176.    Based on these representations and omissions, Littlerock Family Medicine purchased a SculpSure for $180,750, financed over 66 months with a monthly payment of $4,325.67.

177.    Littlerock Family Medicine first treated its employees, with disastrous outcomes:

a.    one employee suffered terrible pain from the procedure, which caused uncomfortable nodules;

b.    another felt burning during the procedure, which caused bruising;

c.    one employee nearly passed out from the excessive heat;

- 45 -

    d.      another experienced significant burning and lasting pain for weeks afterward, despite the fact that the SculpSure trainer performed her treatment; and

    e.      not one employee experienced a difference in appearance after being treated.

178.    Patients fared no better. Nearly all complained of the pain, with some asking to take breaks, for an ice pack, or for cold water. Because of this, the practice needed a staff member to remain in the room at all times with the patients during treatment. Patients failed to see the results promised by Cynosure.

179.    The practice complained to Cynosure's Jenna Trost. But Trost blamed Littlerock Family Medicine, suggesting that the staff was not properly using the device and needed more training if patients felt pain. Trost also suggested the practice should hold another open house and market the procedure more to get more clients. This advice did nothing to fix the problems with the treatment.

180.    Littlerock Family Medicine stopped offering SculpSure to patients because of the problems. With no way to recoup the cost of the machine, however, Littlerock Family Medicine has been under serious financial strain. The efforts to make SculpSure work as a viable business opportunity have drained time, energy, and resources from the practice.

181.    Littlerock Family Medicine has suffered actual damages arising out of Defendant's misrepresentations and its purchase of SculpSure.

**13.    Mehmet C. Pekerol M.D., P.C.**

182.    Dr. Mehmet C. Pekerol owns and operates a medical practice in West Hollywood, California, specializing in weight loss, skin care, anti-aging medicine, and various cosmetic procedures.

183.    Dr. Pekerol first learned about SculpSure in February 2016 during a lecture organized by Cynosure, at which Dr. R. Stephen Mulholland presented. Dr. Pekerol also spoke to Dr. Diane Kibbel, who claimed the technology worked, although she did not disclose that she was a paid spokesperson for SculpSure.

184.    Cynosure representative Kris Huston represented to Dr. Pekerol that the device was:

a.    "the holy grail" of laser technology;

b.    guaranteed to "melt away" 25% of the patient's fat in a single, painless, 25-minute procedure; and

c.    especially effective for highly motivated patients who exercised but just couldn't get rid of stubborn fat pockets or love handles.

185.    Based on these representations, in April 2016, Dr. Pekerol purchased a SculpSure for $160,000.

186.    Once implemented in practice, however, it quickly became evident that Cynosure's claims were false. Dr. Pekerol and his staff witnessed firsthand how painful the procedure could be.

187.    Many patients signed on to receive multiple treatments, yet refused to come back because they couldn't tolerate the pain. Even the most motivated patients failed to achieve adequate results.

188.    The poor patient experiences blemished Dr. Pekerol's reputation in the highly competitive industry. Many patients claimed that they had been scammed. Some long-time, repeat customers never returned to the practice after being treated with SculpSure. Dr. Pekerol had to offer free alternative treatments to other patients. And because Cynosure offered no means

- 47 -

to improve treatment outcomes—aside from increasing marketing via social media—Dr. Pekerol

had little choice but to stop treating patients with SculpSure, or risk further harm to his practice

and patients.

189.    Dr. Pekerol has suffered actual damages arising out of Defendant's

misrepresentations and his purchase of SculpSure.

**14.    Weighless MD LLC d/b/a WeighLess MD and Wellness**

190.    Owned and run by its President, Cheri Stoka, WeighLess MD and Wellness

provides nutrition counseling, dietary supplements, and other medical weight loss services in

Brookfield, Wisconsin.

191.    In early 2017, Jen Grider, a sales representative for Cynosure, represented to

Ms. Stoka that SculpSure:

    a.     would change their practice;

    b.     was better than CoolSculpting, claiming that in just one 25-minute

             treatment, patients would see an average of 24% body fat reduction;

    c.     was "pain free"; and

    d.     was incredibly easy to operate, such that anyone could operate it and the

             staff need not even remain in the room with the patient after initiating the

             treatment.

192.    Grider also promised significant support from Cynosure. She assured Ms. Stoka

that Cynosure would manage all of the marketing and that an employee would be available to

troubleshoot any issues at any given time.

193.    Based on these representations, in March 2017, Ms. Stoka purchased a SculpSure

for $165,750.

- 48 -

194.    Immediately, WeighLess MD experienced problems with the device. The practice first experienced problems during the training and treatment of its staff members, including, *inter alia*, the following:

a.    some staff members endured so much pain during the treatment that they could not finish it;

b.    Ms. Stoka felt she would pass out from the pain and excessive heat; and

c.    none of the staff has seen any difference in fat reduction, despite several receiving as many as three treatments.

195.    Patients underwent similar experiences, frequently becoming upset. The vast majority complained that the procedure hurt, thus requiring a staff member to remain in the room at all times with the patient. The practice struggled to find any patients who achieved results after being treated with SculpSure.

196.    To make matters worse, the machine commonly malfunctioned, shutting down during treatments. When this happened, it would not only extend the treatment time, but WeighLess MD would also lose money in the form of consumable PAC Keys. The practice also experienced downtime and lost patients because of delays by Cynosure in repairing the device.

197.    WeighLess MD frequently complained and wrote a letter to the company detailing issues with the device. Cynosure responded by putting WeighLess on a "Reset Program," through which their practice would be "re-educated" about SculpSure. The program included, among other things, introduction of the "Treat to Complete" treatment plan, advising WeighLess to manage a patient's expectations that multiple treatments may be part of the treatment plan. However, Cynosure never offered a viable solution to the ongoing issues and inherent flaws with the device.

- 49 -

198.    WeighLess MD stopped offering the treatment to patients. It has endured upset clients, provided free treatments, and lost patients. Because of the financial drain SculpSure has placed on the practice, WeighLess MD has been unable to grow the business and has been forced to lay off staff members.

199.    WeighLess MD has suffered actual damages arising out of Defendant's misrepresentations and its purchase of SculpSure.

### 15.    Lash House, LLC d/b/a Lash House Beauty Boutique

200.    Owned and operated by Suzette Zuena, Lash House Beauty Boutique provides facial treatments, body sculpting, hair removal, and other cosmetic procedures for its clients.

201.    In June 2017, Zuena attended Cynosure's Aesthetics Innovation Tour in Philadelphia, Pennsylvania.

202.    Cynosure sales representatives Jack Matarazzo and Luke Vanderbeck aggressively marketed SculpSure to her practice, describing it as:

    a.    "painless" for patients;

    b.    providing an average of 24% body fat reduction per treatment; and

    c.    a simple "lunch time procedure" that, despite its 25-minute treatment time, achieved the "best" results in the noninvasive body contouring industry.

They also "guaranteed" that Lash House would have success with the device.

203.    Based on these representations, Lash House purchased a SculpSure for $155,750 with financing.

204.    SculpSure's primary selling points turned out to be its most significant problems. Patients found the procedure so painful that many refused to return for additional treatments or follow-up. And patients constantly expressed dissatisfaction with results, claiming the procedure

- 50 -

was overpriced. Lash House had to issue refunds or provide additional services for free to keep customers happy.

205.    Despite complaints, Cynosure did nothing to remedy the situation. Instead of taking ownership of the device's shortcomings, Cynosure told Zuena that Lash House had been implementing the treatment incorrectly and marketing SculpSure poorly. Cynosure falsely represented that no other practices had been experiencing the same issues facing Lash House.

206.    Because of the problems with SculpSure, Lash House has lost customers, had to deal with poor reviews, issued refunds, comped services for customers, and been forced to lay off staff. The machine remains a financial burden, which has made it difficult to grow the business.

207.    Lash House has suffered actual damages arising out of Defendant's misrepresentations and its purchase of SculpSure.

**16.    North Creek Medicine Inc., P.S. d/b/a North Creek Medicine & Aesthetics**

208.    Dr. Mark Swyer operates North Creek Medicine & Aesthetics in Everett, Washington. The practice provides a number of skin care, cosmetic, and laser treatment options.

209.    On several occasions in the fall of 2016, Jason Kelso of Cynosure represented to North Creek's front desk staff that SculpSure:

> a.    would achieve approximately 24% (at least 20% and up to 25%, in his words) fat reduction in a single, pain-free treatment;
>
> b.    would provide additive results in subsequent treatments;
>
> c.    was superior to its competitors; and
>
> d.    would generate significant revenue for the practice.

210.    In the fall of 2016, Dr. Swyer also separately met with Kelso, who represented that:

a.    there would be no charge for the device for six months;

b.    SculpSure would be a big profit center for the office;

c.    the device was safe and effective;

d.    Cynosure's testing data was very positive;

e.    SculpSure was better than CoolSculpting, because it could treat a much

bigger area of the body than CoolSculpting;

f.    SculpSure was very user-friendly and hands-free once the patient was

hooked up, such that minimal supervision was needed during the

treatment—i.e., the operator could leave the room and check in

occasionally; and

g.    they would be provided marketing and advertising support by Cynosure,

including attendance and assistance at open house presentations.

211.    Kelso also told Dr. Swyer that the competitor CoolSculpting was quite painful, as

you had to squeeze the tissue during the procedure and there is discomfort from the cold, and that

patients generally did not like that.

212.    Based on these representations, in October 2016, North Creek purchased two

SculpSure devices for a total of $330,000, with financing.

213.    The two devices did not live up to Cynosure's representation. The practice treated

about two or three patients per month between approximately October 2016 and January 2018.

Patients experienced marked pain and bruising. Patients did not see the promised results. One

patient threatened to sue. Dr. Swyer offered refunds and free services to dissatisfied patients

multiple times.

214.    Dr. Swyer did not get the number of patients (or profit) promised from SculpSure's marketing efforts.

215.    Because of these problems, North Creek has stopped offering the device. North Creek spent more on the device than the revenue it was able to generate, and it has lost income and customers. The reputations of North Creek and Dr. Swyer have been impacted, reflected by the severe criticism on Yelp, a lowered rating on Health Grade, and negative word of mouth from patients.

216.    North Creek also lost business opportunities and experienced financial strain. Due to the strain, North Creek had to limit its purchase of other products, like injectibles, and thus the ability to grow the practice in a profitable manner. Dr. Swyer continues to make payments on the devices.

217.    North Creek has suffered actual damages arising out of Defendant's misrepresentations and its purchase of SculpSure.

**17.    Marion Anesthesia, P.C.**

218.    Ann Marie Harman, M.D. owns and operates Marion Anesthesia in Roanoke, Virginia. The practice offers anesthesia care.

219.    During the spring of 2016, Dr. Harman was invited to attend a conference in Baltimore, Maryland, by a Cynosure sales representative, Christopher Chambers, and regional sales representative, Mike Russo. Dr. Harman was also approached by the owner of a med spa to see if he was interested in partnering in a fat-loss machine.

220.    At the conference, Cynosure told Dr. Harman that SculpSure:

     a.     achieved 24% body fat reduction in a 25-minute procedure, which
            Cynosure demonstrated with slides of both ultrasound and pathological
            changes that occurred as a result of the procedure;

b.    was a painless procedure;

c.    was a hands-free procedure—i.e., the staff could hook up the SculpSure

applicators and walk away, giving the patient a call button; and

d.    was a quick treatment, after which patients could immediately resume

normal activity, including going to work or working out at the gym.

221.    Little attention was devoted to discussion of any side effects. Cynosure did

emphasize that the patient should not ingest any anti-inflammatory drugs, which could stop the

changes.

222.    Based upon these representations, on May 25, 2016, Dr. Harman purchased the

SculpSure device for $186,000.00 with financing.

223.    Marion Anesthesia treated 150 patients with SculpSure and constantly

encountered problems with the device. First, the treatment was not painless. After several

minutes, many patients experienced excessive heat or pain. The practice found it an absolute

necessity to give the clients an ice pack to hold or place on their body to distract them from the

pain of the procedure. When Dr. Harman first tried SculpSure on her upper abdomen, she felt on

the verge of fainting and had to be coaxed through to the end of the treatment. During follow-up

appointments, many clients refused to attempt another area due to the discomfort.

224.    Cynosure's claims to Dr. Harman regarding efficacy also proved incorrect.

Patients' before-and-after photos failed to evidence the results promised by Cynosure, even after

three or four treatments. Marion Anesthesia even used an ultrasound to measure clients'

progress, but this only confirmed that patients were not responding to the treatment well.

Dr. Harman's own ultrasound measurements after two treatments demonstrated a negligible

change—nowhere near the 24% advertised by Cynosure for just one treatment.

225.    Marion Anesthesia could not permit staff to leave the room during a treatment. Patients required constant attention throughout the procedure due to the intense heat and pain. Moreover, if a loose connection alarm went off, it needed to be addressed within fifteen seconds or the treatment would stop and need to be restarted. Finally, the belts provided for the procedure required constant supervision, as the weight of the applicators would be difficult to maintain with the appropriate pressure amid the normal mechanism of breathing.

226.    As a result, the issues with SculpSure have caused Marion Anesthesia financial harm, damaged its reputation, and cost the practice clients.

227.    Dr. Harman has suffered actual damages arising out of Defendant's misrepresentations and its purchase of SculpSure.

**18.    Bernadette Bonaparte, M.D., P.A.**

228.    Bernadette Bonaparte, M.D. operated an internal medicine practice from her offices in Richmond, Texas.

229.    Dr. Bonaparte first learned of the SculpSure device in 2016 from Dr. Seth Osafo of the Osafo Clinic in Bollingbrook, Illinois, which had just purchased a SculpSure machine.

230.    After Dr. Bonaparte contacted Cynosure, a representative named Tyler Lembke spoke with her on the phone. During this August 2016 phone conversation, Lembke told her that the SculpSure device:

      a.    was superior to CoolSculpting;

      b.    was the only FDA-approved treatment for fat destruction;

      c.    did not leave any bumps or bruises like CoolSculpting;

      d.    was pain free;

      e.    was an easy lunchtime procedure, with no downtime, such that the patient could return to work;

- 55 -

     f.     was hands-free, permitting the operator to leave the room after initially

           setting up the patient; and

     g.     would achieve up to 24% fat reduction in just one treatment.

231.    Lembke told her that she would be contacted by the SculpSure marketing team to make marketing arrangements. He also sent her an email.

232.    Based upon these representations, on August 16, 2016, Dr. Bonaparte purchased the SculpSure device for $165,750.00 with financing.

233.    On September 9, 2016, Cynosure's Melissa Williams conducted a training session for Dr. Bonaparte and her staff. Williams provided pre- and post-treatment instructions and a written brochure.

234.    Williams provided oral and written representations that reinforced Cynosure's pre-sale representations, including that the SculpSure device provided non-surgical fat reduction and over 90% patient satisfaction, and that it was comfortable and well-tolerated. Written representations further indicated that the procedure only took 25 minutes and would destroy up to 24% of fat cells without surgery. Williams told Dr. Bonaparte that it was not necessary to be present during treatment.

235.    For the first time in this meeting, in contradiction to the pre-sale representations, Williams told Dr. Bonaparte that multiple treatments were necessary—the second treatment following six weeks after the initial treatment.

236.    Williams also admitted that some patients would not be able to tolerate the treatment due to pain—the opposite of what Dr. Bonaparte was told *before* she purchased the device. And Williams added that because fat destruction occurred best at the higher treatment levels, the operator would need to "push" patients to the maximum treatment settings despite

- 56 -

tolerability issues. In practice, such methods proved difficult to implement because patients could not tolerate the higher settings.

237.    The hands-free representations were also not accurate. Dr. Bonaparte needed to be present during the entire procedure and coach patients to the end of the treatment. Dr. Bonaparte treated approximately seven patients with SculpSure. Approximately 90% are dissatisfied. Some patients required pain medications—for example, Ketorolac or Tylenol. Dr. Bonaparte also found it necessary to monitor patients' blood pressure, which would sometimes be elevated due to the severe pain. She had to sometimes administer blood pressure control medication due to elevated blood pressure. Due to pain, two of her patients stopped their treatment entirely. Not surprisingly, Dr. Bonaparte's patients expressed dissatisfaction with their experience and the lack of results.

238.    She complained to Cynosure, to no avail. The company stated that it could not help Dr. Bonaparte, only providing her with the name of an independent contractor to whom she could sell the device. After a failed attempt to sell her SculpSure, the machine eventually was repossessed. Under significant financial strain, Dr. Bonaparte was forced to close her practice on June 30, 2018.

239.    Dr. Bonaparte has suffered actual damages arising out of Defendant's misrepresentations and the purchase of SculpSure.

**19.    Body NV LLC**

240.    Body NV LLC was a Nevada limited liability company owned and operated by Joy Gibson.

241.    Joy Gibson first learned about SculpSure in the fall of 2016 when a Cynosure sales representative pitched SculpSure to the OBGYN practice where she worked. While the

OBGYN practice was not interested, Ms. Gibson was. Accordingly, Ms. Gibson met separately

with the Cynosure sales representative, Sharon Knecht, on several occasions.

242.    At these meetings, Knecht told Ms. Gibson that:

a.    SculpSure would achieve a 24% fat reduction in a single pain-free and
       hands-free treatment;

b.    these attributes made the treatment easy to sell; and

c.    the SculpSure device would be paid off in six months with the number of
      patients she would have.

243.    Based on these representations, on September 22, 2016, Ms. Gibson purchased

the device for $163,382.50, funding the purchase with a $175,000 withdrawal from her retirement

savings. She then associated with a doctor to open a medical aesthetics practice and run the

device.

244.    Gibson quickly learned that Cynosure's representations were false. The patients

treated with SculpSure at Body NV complained of great pain. Patients complained about poor

results; approximately 95% expressed dissatisfaction. Some patients developed painful nodules,

forcing Body NV to offer free treatments to attempt to reduce them. Others received refunds.

245.    Over time, the only way patients would agree to SculpSure treatments was if

Gibson significantly reduced the price. When she purchased the SculpSure device, the Cynosure

sales representative told Gibson that she would be able to sell each treatment for $1,000 to

$1,500 per treatment. Cynosure later came in and told Gibson to stay competitive, she should

only charge $500.

246.    Gibson moved with her SculpSure machine twice in an attempt to reduce her

expenses. In March 2017, she merged her practice with another doctor in Las Vegas, Nevada. In

June 2017, Ms. Gibson merged her practice with Richards Cosmetic Surgery in Las Vegas, Nevada.

247.    Ultimately, Body NV found the treatment nearly impossible to sell. It could not recommend a treatment that its patients found excruciating and that failed to deliver results. Ms. Gibson tried the device and found the treatment to be extremely painful. She had bruising and large nodules under each applicator. Ms. Gibson's skin is still slightly discolored where the applicators were.

248.    Because of these problems, Body NV stopped using the SculpSure device. Ms. Gibson attempted to find a buyer for the machine, but learned that it has practically no resale value because of the problems. The device has caused harm to the practice's reputation and finances.

249.    Body NV has suffered actual damages arising out of Defendant's misrepresentations and its purchase of SculpSure.

**20.    Dynamic Body Sculpting, P.C.**

250.    Christopher Reddoch, M.D. owned and operated Dynamic Body Sculpting in Columbus, Georgia. Dr. Reddoch created Dynamic Body Sculpting for the exclusive purpose of offering SculpSure to patients.

251.    Dr. Reddoch first learned of the SculpSure device in February 2017 from Cynosure sales representative Chris Cononi. In their meeting, which also included Dr. Reddoch's colleague, Dr. Key, and his business partner, Cononi promoted SculpSure's efficacy, claiming that:

            a.    patients would require just one 25-minute treatment, for which he could
                  typically charge $1,400 to $2,000 per patient;

- 59 -

b.   the tolerability of the procedure was high, noting that patients would feel

nothing more than a gentle warming sensation;

c.   because of these traits, SculpSure would undoubtedly generate enough

revenue to pay for itself within six to seven months; and

d.   all marketing, which Cynosure would handle, was included in the price of

the machine.

252.   Cononi and Dr. Reddoch had numerous conversations by phone and email prior to

purchase. Dr. Reddoch explained multiple times that he did not have a pre-existing aesthetic

practice and planned to open a brand new clinic that offered only SculpSure.

253.   Based on these representations, on May 22, 2017, Dr. Reddoch purchased the

SculpSure machine for $145,252.50, financed through a personal loan payable at six months. He

then opened his practice, Dynamic Body Sculpting, which would exclusively offer SculpSure to

its clients.

254.   In the first week of owning the machine, Cynosure's training instructor, Marina

Reid, visited Dynamic Body Sculpting. At that training, Dr. Reddoch was surprised to hear Reid

advise him that he would need to evaluate his patients and design a "treat to complete" plan, or

multiple treatment plan, for them.

255.   Reid also admitted that the device was painful, requiring patients to bear with it.

She advised that Dr. Reddoch should use the cooling option for relief. She also said the patients

would be sore afterwards.

256.   Dr. Reddoch and his sister tried the treatment in that meeting; both found it

painful.

257.    Reid returned on another occasion a few weeks later and again tested the procedure on Dr. Reddoch. Dr. Reddoch had to discontinue early due to the pain.

258.    Patient treatments did not fare well either. Dynamic Body Sculpting treated four patients with SculpSure between November 2017 and March 2018. The treatments ranged from painful to extremely painful to intolerable. Three patients complained about the pain, did not return, and would not return Dr. Reddoch's phone calls to discuss the experience. Only one of the original four patients returned for a second treatment. The patients also complained that they did not see a difference from the treatment.

259.    Six months after the purchase, Dr. Reddoch took out a high interest loan to try to pay back the personal loan initially used to finance the device.

260.    When Dr. Reddoch complained to Cynosure via letter that the machine was not working, he was told by a representative that the only assistance they could provide was improved marketing efforts and more pointers on how to advertise. But, aside from two visits by Cynosure representative Nicole Morrison to set a date for an open house, Cynosure's marketing was non-existent.

261.    Cynosure provided illegible, inaccurate fliers for the one scheduled open house that Dynamic Body Sculpting could not use. There was no guidance on the best places to market the open house or how to utilize the material effectively. The practice sent out invitations at its own expense and tried to promote through social media.

262.    Cynosure's representative conveyed that she would not attend the kick-off open house event because not enough people RSVP'd. The practice eventually re-scheduled the open house. Two Cynosure representatives attended, but were not involved in the presentation. The open house did not generate any business, aside from an occasional consultation.

263.    Because of these problems, Dynamic Body Sculpting stopped offering SculpSure, which effectively closed the business. Dr. Reddoch could not stake his reputation on a procedure with such a poor patient experience and negative treatment outcomes. He is still paying rent and utilities for the business as he is locked into a long-term lease, and is still making monthly payments on the device of $3,361.05. The device is being stored in the otherwise empty office.

264.    Dynamic Body Sculpting has suffered actual damages arising out of Defendant's misrepresentations and its purchase of SculpSure.

**21.    Sewickley Med Spa, LLC**

265.    Owned and operated by Mitchell Unis, Sewickley Med Spa opened in 2010 in Aliquippa, Pennsylvania. It provides a variety of skin and laser treatments.

266.    In late 2015 or early 2016, a staff member at Sewickley Med Spa was researching CoolSculpting and other fat-reduction devices when she came across information regarding SculpSure. She informed Unis, who then contacted Cynosure for more information.

267.    In early 2016, Cynosure sales representative Tom Brown met with Mr. Unis, his staff, and his staff physician, Dr. Thomas Michael. Tom Brown compared SculpSure to CoolSculpting, and promised that:

    a.    SculpSure achieved better treatment results (24% reduction) in a shorter procedure;

    b.    unlike CoolSculpting, SculpSure required just one "painless" treatment;

    c.    SculpSure generated significantly larger profit margins than CoolSculpting; and

    d.    SculpSure could be set up and connected to the patient by staff, who could then leave the room during the treatment while the patient watched a movie or played games on his or her mobile device.

268.    A different sales representative, Joe Amon, met with the practice on February 29, 2016. Amon reiterated the same representations as Tom Brown, discussed tests and trials that had been conducted, represented that all surgeons had experienced tremendous success with the device, and provided specific names as references.

269.    Based on these representations, on February 29, 2016, Sewickley Med Spa agreed to purchase a SculpSure for $165,750.00 with financing. Dr. Michael co-signed the lease.

270.    Many of Cynosure's representations regarding SculpSure proved false from the start. During Sewickley Med Spa's training, it became apparent that the procedure would indeed be painful. Further, staff needed to remain in the room to ensure that the applicators did not lose contact with the skin and to give the patient a "cool blast" from the device when the heat became unbearable.

271.    SculpSure treatments did not result in any outcomes that matched the descriptions given by Cynosure. Patients routinely expressed disappointment when they compared "before" and "after" photos at their six-week follow-up appointment. Even staff members who received a SculpSure treatment four or five times in the area struggled to see any noticeable difference.

272.    Sewickley Med Spa offered additional treatments to unsatisfied patients to achieve a better result, but most did not want to part with more money after failing to get anything out of the first treatment. Their dissatisfaction mounting, many clients did not bother to return for their twelve-week follow-up appointment. Those that did come to the follow-up appointment again expressed disappointment to the staff. Sewickley Med Spa was forced to offer free or discounted treatments to maintain patient satisfaction.

273.    When Sewickley complained to Austin Monroe, the practice's account manager at Cynosure, Monroe recommended an additional training session. At this session, Cynosure

informed the staff that, while their placement of the applicators had been correct, the company now recommended using *more* applicators to treat all surrounding areas. This recommendation meant a single session with SculpSure would require multiple treatments, significantly increasing the cost of the procedure and the treatment time. Cynosure also informed Sewickley that it had changed its protocol to two treatment sessions. But even with two sessions, patients did not see results.

274.     Over time, the machine became an increasing drain on the practice. The practice lost thousands of dollars on advertising. The failed treatments impacted the office's reputation. Patients who underwent the procedure hesitated trying other treatments. The practice could not purchase certain skin care products, cosmetic fillers, and Botox products while finances were tied up in SculpSure payments. Short on these products, the office had to reschedule appointments, with some clients taking their business elsewhere. Sewickley Med Spa no longer treats patients with SculpSure.

275.     Sewickley Med Spa has suffered actual damages arising out of Defendant's misrepresentations and its purchase of SculpSure.

**22.    Plastic Surgery Specialists, P.C.**

276.     Plastic Surgery Specialists is a Maryland professional corporation owned by Dr. Paul Buhrer and Dr. Christopher Spittler.

277.     Dr. Buhrer learned of SculpSure from Cynosure representative Chris Chambers. At an April 2016 meeting with Chambers and his manager, Dan Wilson, and Dr. Buhrer, his partner, and their office manager, Cynosure represented that SculpSure:

> a.     would achieve a 25% body fat reduction in the first treatment, and 20% for each additional treatment;

    b.      achieved skin tightening (but admitted that they were "not allowed" to say this); and

    c.      was not painful;

278.    Cynosure also represented that SculpSure beat CoolSculpting—which Plastic Surgery Specialists already owned—because SculpSure had several advantages:

    a.      it achieved the same efficacy but was easier to tolerate than CoolSculpting as there would be just minimal discomfort;

    b.      SculpSure's treatment time was shorter in duration (the treatment would last approximately 25 minutes compared to CoolSculpting's roughly one-hour duration at the time);

    c.      it was a hands-free treatment, as staff could leave the room once the patient was set up;

    d.      CoolSculpting lacked the skin tightening component (it removed fat, but skin laxity may still exist); and

    e.      four areas could be treated on SculpSure at the same time, versus just one area with the CoolSculpting device.

279.    Based on these representations, on April 25, 2016, Dr. Buhrer purchased the SculpSure device for $175,650.00 (including $750.00 freight and $9,900.00 sales tax), with financing.

280.    Plastic Surgery Specialists treated 51 patients with SculpSure, the vast majority of which expressed dissatisfaction. Unlike its CoolSculpting patients, who achieved visibly noticeable results, SculpSure patients did not. Nearly half of the patients never returned to the practice for follow-up appointments due to poor results.

281.    Pain also proved to be an issue, both during and after the treatments. Three patients even suffered from persistent pain following the treatment that required prescription medication, pain patches, and/or valium. Four were given discounted surgery quotes; two were given free CoolSculpting treatments.

282.    Complaining to Cynosure did little to remedy the situation. Cynosure only recommended more training, insisting that the practice must be doing something wrong.

283.    In the end, SculpSure did considerable harm to Plastic Surgery Specialists' business. The practice lost money, lost customers, suffered harm to its reputation, issued refunds, provided free treatments, and missed out on business opportunities with its capital tied up. Plastic Surgery Specialists, therefore, no longer uses SculpSure.

284.    Plastic Surgery Specialists has suffered actual damages arising out of Defendant's misrepresentations and its purchase of SculpSure.

**23.    Savannah Facial Plastic Surgery, LLC**

285.    Dr. Timothy Minton owns and operates Savannah Facial Plastic Surgery in Savannah, Georgia.

286.    Dr. Minton first learned about SculpSure in early 2016 while researching other laser devices and noninvasive fat reduction devices such as CoolSculpting. Eventually, he met with Gabe Lubin, Chris Cononi, and Dominic Amaral of Cynosure. In their meeting, the representatives stated that SculpSure:

      a.    achieved 24% fat reduction in a single 25-minute treatment; and

      b.    scored high in patient tolerability, asserting patients would feel very little discomfort if at all.

287.    They also claimed that Cynosure would initiate an "aggressive" national marketing campaign for SculpSure.

288.    Based on these representations, in July 2016, Savannah Facial Plastic Surgery purchased a SculpSure machine for $181,750.00.

289.    Savannah Facial Plastic Surgery treated 25 patients with SculpSure. But Dr. Minton found that the treatments did not match the descriptions made during the sales pitch. The treatment was far more painful than described and many patients had difficulty tolerating the treatment. Dr. Minton and his staff occasionally had to provide patients with sedatives to complete the treatment.

290.    Savannah Facial Plastic Surgery reached out to Cynosure with their concerns. Cynosure responded with the new "treat to complete" protocol. The protocol recommended at least two treatments per area, and noted the need to treat more than one area to see results in the abdomen.

291.    The change contradicted Cynosure's pre-sale representations and had a significant impact on the practice's ability to sell the procedure. The price for multiple SculpSure treatments made it difficult to sell, forcing the practice to lower its treatment price. Further, the benefit of a single 25-minute treatment turned into multiple sessions with multiple treatments.

292.    To make matters worse, Savannah Facial Plastic Surgery saw poor results from the device. When Dr. Minton and his staff met with additional trainers and representatives from Cynosure, the trainers reviewed his office's treatment charts and found that Dr. Minton and his staff were performing the treatments to standard. Another representative observed Dr. Minton and his staff treating two patients and likewise found no issues with the office's patient selection process or treatment protocol.

293.    Over time, SculpSure has harmed Savannah Facial Plastic Surgery's finances and reputation. The practice lost faith in the treatment and no longer offers SculpSure to its patients.

- 67 -

294.    Savannah Facial Plastic Surgery has suffered actual damages arising out of Defendant's misrepresentations and its purchase of SculpSure.

**24.    Orlando Plastic Surgery Center LLC**

295.    Dr. George Pope owns and operates Orlando Plastic Surgery in Orlando, Florida.

296.    In early 2016, Dr. Pope began investigating non-surgical alternatives, such as CoolSculpting, to reduce unwanted areas of fat. In May 2016, he received an invitation from Cynosure Senior Account Manager Dave Levin to a SculpSure workshop in Ft. Lauderdale, Florida. In September 2016, Scott Hidalgo of Cynosure contacted Dr. Pope.

297.    Hidalgo represented that SculpSure:

   a.    was a one-time procedure that achieved 24% fat reduction in just a single 25-minute treatment;

   b.    would be painless for patients; and

   c.    could be operated "hands-free."

298.    Hidalgo also placed Dr. Pope in contact with Dr. Ross Clevens, who claimed his SculpSure paid for itself in six months and that it was like "printing money."

299.    Based on these representations, on September 28, 2016, Dr. Pope purchased the SculpSure device for $150,750 with financing.

300.    In the fall of 2016, Staci Cleveland of Cynosure attended an evening seminar at Dr. Pope's office to solicit SculpSure patients. Cleveland helped Dr. Pope evaluate attendees for the procedure. Cleveland stated that all of those examined would be good candidates for SculpSure. Cleveland never once cautioned Dr. Pope that the procedure would work only on patients within a certain weight range.

- 68 -

301.    Orlando Plastic Surgery Center experienced problems with the device almost immediately. Most of the office staff who received a SculpSure treatment complained of how much the treatment hurt, with one staff member refusing additional treatments because of pain.

302.    The practice treated approximately 43 patients with SculpSure, but the vast majority found the treatment painful and saw little-to-no improvement following the procedure. Dr. Pope even surveyed his patients about their experience with SculpSure and respondents overwhelmingly stated that they were unhappy with their results, the treatments were expensive and ineffective, and they would not recommend the treatment to friends.

303.    When Dr. Pope complained to his Cynosure trainer, Mary Stoll, Stoll informed Dr. Pope that Cynosure had implemented a new treatment protocol called "Treat to Complete." Stoll informed him that Cynosure now recommended a series of circumferential treatments (that is, treating more than just one or two areas) to achieve the necessary results. When Dr. Pope responded that this contradicted Cynosure's prior representations and would be cost-prohibitive for many patients, Stoll responded that "maybe SculpSure is not for them."

304.    Dr. Pope also showed Stoll before-and-after photos of dissatisfied SculpSure patients. Stoll blamed the poor results on the practice for not being strict enough with its patient selection in terms of weight. This, however, contradicted SculpSure's earlier representations— and help—regarding patient selection.

305.    Ultimately, because of the mounting patient complaints and contradictions from Cynosure, Orlando Plastic Surgery Center had to cease operating SculpSure. As a result, Orlando Plastic Surgery Center has suffered substantial losses. It continues to make payments for a device it cannot use, has been forced to offer free treatments to almost every SculpSure patient, and spent thousands promoting a procedure it can no longer offer. The practice even had to lay off an

- 69 -

employee who had been responsible for running the SculpSure program at Orlando Plastic

Surgery Center.

306.     Orlando Plastic Surgery Center has suffered actual damages arising out of

Defendant's misrepresentations and its purchase of SculpSure.

## V.     CLAIMS ALLEGED

### COUNT I
### VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT
### (G.L. CHAPTER 93A)

307.     Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

308.     This cause of action is brought by Plaintiffs pursuant to the Massachusetts

Consumer Protection Act, G.L. Chapter 93A §§ 2, 11, *et. seq*. Section 2 of the Massachusetts

Consumer Protection Act provides that "[u]nfair methods of competition and unfair or deceptive

acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

309.     Plaintiffs and Defendant are "persons" under the Massachusetts Consumer

Protection Act pursuant to G.L. Chapter 93A § 1(a).

310.     SculpSure is tangible property involved in "trade" and "commerce" subject to the

Massachusetts Consumer Protection Act pursuant to G.L. Chapter 93A § 1(b).

311.     At all relevant times, Defendant violated and continues to violate the

Massachusetts Consumer Protection Act in its transactions regarding SculpSure. Specifically,

Defendant deceived Plaintiffs by misrepresenting certain qualities and attributes of the SculpSure

procedure. Defendant misrepresented, *inter alia*, to Plaintiffs that:

  a.     SculpSure requires only one 25-minute treatment to achieve 24% fat loss,

  when in fact it requires multiple treatments and still is likely to be

  ineffective;

- 70 -

      b.    the treatment was virtually painless and easily tolerable without any pain medication or anesthesia, when in fact it is very painful and patients routinely could not tolerate the procedure; and

      c.    SculpSure could be performed hands-free without a physician or trained staff member present during the entire procedure, when in fact one was required at all times to monitor energy levels.

312.    Defendant's deception has caused substantial injury to Plaintiffs. Plaintiffs cannot recommend a procedure that involves several painful treatments and still does not yield any meaningful result in the patient. And so they have spent hundreds of thousands of dollars on a machine that is ultimately inappropriate for their practice and does not work in a commercially viable way. The machine effectively goes unused, not only denying Plaintiffs the ability to make a profit, but also the opportunity to recoup the sizeable costs already incurred. Plaintiffs have lost money and had their businesses placed under considerable financial strain.

313.    Accordingly, as a direct and proximate result of Defendant's deceptive acts and practices, Plaintiffs did not receive the benefit of the bargain, suffered actual damages, and are entitled to trebling, plus attorneys' fees and costs.

## COUNT II
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

314.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

315.    Under Massachusetts law, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."[36]

---

[36] MASS. GEN. LAWS ANN. CH. 106, § 2-314(1).

To be merchantable, goods must at least be "fit for the ordinary purposes for which such goods are used."[37]

316.    Defendant is a merchant under Massachusetts law who specializes in the marketing and sale of medical devices utilizing laser technology for cosmetic and aesthetic use. Defendant designed, manufactured, and marketed SculpSure, a noninvasive body-contouring device, in Massachusetts.

317.    Beginning in late 2015, Defendant marketed and sold the SculpSure device all over the country. In selling the device, Defendant specifically targeted cosmetic and aesthetic medical practices, including small medical offices and med spas like Plaintiffs. In selling to Plaintiffs, Defendant represented that SculpSure would be appropriate for their practices, namely because it: (a) involves only one simple 25-minute treatment to achieve 24% fat loss; (b) is virtually painless and easily tolerated by the patient without pain medication or anesthesia; and (c) could be performed hands-free without a physician and/or trained staff member present during the entire procedure.

318.    At no time, however, has SculpSure actually been suitable for the ordinary purposes for which it is intended. Even when Plaintiffs use the machine as envisioned by Defendant's marketing and as directed by Defendant, SculpSure cannot successfully be performed as a one-time treatment, frequently causes significant pain in the patient, and requires hands-on assistance from a physician or trained staff member to administer the treatment. It is thus not fit for use in medical spas, physician offices, or as otherwise marketed by Defendant.

319.    As a consequence, Plaintiffs have spent hundreds of thousands of dollars on a machine that is not suitable for their practices. Plaintiffs have lost money and had their

---

[37] MASS. GEN. LAWS ANN. CH. 106, § 2-314(2)(b).

businesses placed under considerable financial strain. Accordingly, Plaintiffs did not receive the benefit of the bargain, suffered actual damages, and are entitled to trebling, plus attorneys' fees and costs.

## COUNT III
## UNJUST ENRICHMENT

320.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

321.    Plaintiffs purchased or leased SculpSure machines from Defendant. In turn, Defendant has received significant revenue from Plaintiffs for their purchases or leases of the machine, as well as their purchase of PAC Keys.

322.    Defendant has frequently touted the success of its sales of SculpSure, directly attributing the company's record revenues to sales of the machine.[38] Likewise, Hologic, Inc., who acquired Defendant for approximately $1.44 billion in early 2017, consistently singled out SculpSure when discussing reasons for the massive acquisition of the company.[39]

323.    Defendant's enormous financial gains, however, come at the expense of Plaintiffs. Plaintiffs purchased SculpSure because Defendant marketed the device as not only suitable for their practice, but as premier technology. Defendant touted certain attributes, namely that SculpSure: (a) involves only one simple 25-minute treatment to achieve 24% fat loss; (b) is virtually painless and easily tolerated by the patient without pain medication or anesthesia; and (c) could be performed hands-free without a physician and/or trained staff member present during the entire procedure. The company also made bold claims about its direct-to-consumer marketing strategy.

---

[38] CYNO – Q2 2016 Cynosure Inc. Earnings Call, at 3 (Jul. 26, 2016).
[39] HOLX – Hologic Inc. to Acquire Cynosure Inc. Conference Call, at 4, 6-7, 9 (2017).

010674-11 1053255 V2

324.    But in practice, SculpSure has shown to possess none of the characteristics represented by Cynosure, and the company has not followed through with its promised "marketing blitz."

325.    The procedure cannot successfully achieve results as a one-time treatment. SculpSure causes significant pain in countless patients. And it requires hands-on assistance from a physician or trained staff member to administer the treatment. Plaintiffs cannot recommend a procedure that involves several painful treatments and does not yield any meaningful results, and the machines effectively go unused.

326.    Accordingly, it would be inequitable and unjust for Defendant to retain its ill-gotten fortune, which should be disgorged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court issue an order:

A.    Finding that Cynosure breached the implied warranty of merchantability, violated the Massachusetts Consumer Protection Law, and was unjustly enriched;

B.    Awarding Plaintiffs all appropriate damages, including trebling;

C.    Awarding Plaintiffs restitution in the form of complete disgorgement of all revenue derived from sales or leasing of the SculpSure product and PAC keys;

D.    Awarding Plaintiffs their reasonable litigation expenses and attorneys' fees;

E.    Entering such other injunctive and/or declaratory relief as necessary to protect the interests of Plaintiffs; and

F.    Awarding such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiffs demand a trial by jury for all issues so triable.

Dated: January 24, 2019                    Respectfully Submitted,

                                           HAGENS BERMAN SOBOL SHAPIRO LLP

                                           By: */s/ Lauren Guth Barnes*
                                               Lauren Guth Barnes (BBO# 663819)
                                           55 Cambridge Parkway, Suite 301
                                           Cambridge, MA 02142
                                           Telephone: (617) 482-3700
                                           Facsimile: (617) 482-3003
                                           Email: lauren@hbsslaw.com

                                           Elizabeth A. Fegan
                                           Mark T. Vazquez
                                           HAGENS BERMAN SOBOL SHAPIRO LLP
                                           455 Cityfront Plaza Drive, Suite 2410
                                           Chicago, IL 60611
                                           Telephone: (708) 628-4949
                                           Facsimile: (708) 628-4950
                                           Email: beth@hbsslaw.com
                                           Email: markv@hbsslaw.com

                                           Steve W. Berman
                                           HAGENS BERMAN SOBOL SHAPIRO LLP
                                           1301 Second Avenue, Suite 2000
                                           Seattle, WA 98101
                                           Telephone: (206) 623-7292
                                           Facsimile: (206) 623-0594
                                           Email: steve@hbsslaw.com

                                           David Freydin
                                           Timothy A. Scott
                                           FREYDIN LAW FIRM LLP
                                           8707 Skokie Boulevard, Suite 305
                                           Skokie, IL 60077
                                           Telephone: (847) 972-6157

                                           *Attorneys for Plaintiffs*

010674-11 1053255 V2